1  Alex R. Straus, Esq., CA Bar No.: 321366
2  astraus@milberg.com
3  *Attorney for Plaintiff*
4  MILBERG COLEMAN BRYSON
5  PHILLIPS GROSSMAN, PLLC
6  280 S. Beverly Drive, Penthouse, Beverly Hills, CA 90212
7  Tel.: (919) 600-5000 / Fax: (919) 600-5035

8
9              **UNITED STATES DISTRICT COURT**
10             **CENTRAL DISTRICT OF CALIFORNIA**
11
12
13  **SERIES 15-09-321, a Delaware entity,**          | **Case No.:**
14
15         **Plaintiff,**
16  **v.**
17
18  **FARMERS INSURANCE EXCHANGE;**
19  **MIDCENTURY INSURANCE COMPANY;**                  | **JURY TRIAL**
20  **21st CENTURY CENTENNIAL COMPANY;**               |   **DEMAND**
21  **FOREMOST INSURANCE COMPANY**
22  **GRAND RAPIDS, MICHIGAN; FARMERS**
23  **INSURANCE COMPANY, INC.; and FARMERS**
24  **INSURANCE COMPANY OF WASHINGTON**
25
26         **Defendants.**
27
28                      **COMPLAINT**

29        Plaintiff, Series 15-09-321 brings this action against Farmers Insurance

30  Exchange, Mid-Century Insurance Company, and 21st Century Foremost

31  Insurance Company Grand Rapids, Michigan, and Farmers Insurance

32  Company, Inc., and Farmers Insurance Company of Washington (singularly

33  "Defendant" and collectively, "Defendants"), and alleges:

## **INTRODUCTION**

1.      The Medicare program spent $756 billion (roughly 12% of the entire federal budget) in fiscal year 2022 to provide health insurance for roughly 65 million people (around 20% of the U.S. population) who are aged 65 and older or have disabilities. With the aging population expected to become nearly a quarter of the U.S. population by 2060 (95 million people), one of Medicare's main trust funds is expected to run dry by 2028.[1] For these reasons, identifying and correcting fraud, waste, and abuse—and ensuring the Medicare pays only for bills Congress intended to pay—is more important now than ever before to ensure the long-term sustainability of an essential federal program that has been in existence since 1965.

2.      More than 40 years ago, in 1980, Congress first addressed fears regarding Medicare insolvency by passing with overwhelming bipartisan support the Medicare Secondary Payer Act (the "MSP Act"). The intent of the MSP Act was to staunch the tide of "ballooning medical entitlement costs." *Netro v. Greater Baltimore Med. Ctr., Inc.*, 891 F.3d 522, 524 (4th Cir. 2018).

---

[1] https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/07/fact-sheet-the-presidents-budget-extending-medicare-solvency-by-25-years-or-more-strengthening-medicare-and-lowering-health-care-costs/ (last visited October 1, 2023) ("[T]he most recent Medicare Trustees Report projected that the HI Trust Fund would be insolvent in 2028 . . . ."). The HI Trust Fund provides funding for Medicare Part A services, such as hospital stays.

1    Prior to the MSP Act, Medicare paid for all medical treatment within its scope

2    and left private insurers merely to pick up whatever expenses remained. With

3    the MSP Act, Congress mandated that auto insurers like Defendants—rather

4    than Medicare—would become primarily responsible for medical expenses

5    covered by their insurance policies.

6        3.    Instead of allowing insurers to accept premiums from their

7    policyholders and then sit back while Medicare paid medical bills covered by

8    the insurers' policies, Congress mandated that the insurers would be primary

9    payers and Medicare would simply provide a safety net for its beneficiaries in

10   the event the insurance carriers did not promptly pay. In short, Congress

11   intended through the MSP Act to transfer the cost and financial burden of

12   healthcare to private insurance plans who were receiving premiums expressly

13   intended to cover the medical expenses being paid by Medicare prior to the

14   MSP Act. Congress enacted section 1395y(b)(1) to reduce federal expenditures

15   by making private automobile insurers primarily liable for the cost of servicing

16   their policies.

17

18       4.    Subsequently, when Congress created the Medicare Advantage

19   option under Part C of Medicare, 42 U.S.C. § 1395w-21(a)(1)(B), it ensured

1    that Medicare Advantage Organizations ("MAOs"), just like Medicare, would

2    be deemed the *secondary payer* when the Medicare beneficiaries' medical

3    expenses are covered concurrently by other insurance policies. 42 U.S.C. §

4    1395w-22(a)(4). Medicare Part C permits Medicare beneficiaries to choose to

5    receive their health care benefits from private insurers through MAOs. As of

6    June 2023, over 31 million individuals—nearly 40% of all Medicare

7    beneficiaries—had elected to enroll with an MAO and participate in a Medicare

8    Advantage Plan ("MA Plan").[2]

9         5.    To protect Medicare beneficiaries, Congress authorizes both

10   Medicare and MAOs to go ahead and pay a beneficiary's medical expenses first

11   when a primary player has not made or cannot reasonably be expected to make

12   payment promptly. 42 U.S.C. § 1395y(b)(2)(B)(i). Such payments are

13   "intended to minimize patient anxiety about the source of payment and to avoid

14   delays in reimbursement for" medical expenses. H.R. Rep. No. 97-208, pt. 2,

15   at 956 (1981) However, under the MSP Act, Medicare's and the the MAO's

16   payment is conditioned on the primary payer—the insurer—ultimately

17   reimbursing Medicare and the MAO. 42 U.S.C. § 1395y(b)(2)(B)(ii). In this

---

[2] Monthly Contract and Enrollment Summary Report, Ctrs. For Medicare & Medicaid Servs., https://www.cms.gov/ResearchStatistics-Data-and-Systems/Statistics-Trends-and-Reports/MCRAdvPartDEnrolData/Monthly-Contract-and-Enrollment-Summary-Report (last visited October 1, 2023)

1   way, Medicare beneficiaries receive the health care they need, but Medicare

2   remains entitled to reimbursement.

3       6.      When Medicare or an MAO makes a payment that a primary plan

4   was responsible for, the payment is conditional. This rule applies any time an

5   insurer contests liability at the time of the Medicare or MAO payment, or even

6   where Medicare or the MAO paid for a medical expense simply because it "did

7   not know that the other coverage existed." 42 C.F.R. § 411.21.

8       7.      To ensure that Medicare would be reimbursed, Congress provided

9   the United States government a cause of action to obtain reimbursement from

10  a primary plan. *See* 42 U.S.C. § 1395y(b)(2)(B)(iii). When that addition proved

11  insufficient to ensure primary payers such as insurance carriers were

12  reimbursing Medicare, Congress enacted a private cause of action so that

13  persons and private entities could recover conditional payments made by

14  Medicare (and, later on, MAOs) when insurers failed to reimburse Medicare

15  and MAOs for the payments made for expenses that were covered by their

16  insurance policies. Congress provided for double damages so that private

17  litigants would be incentivized to pursue a recalcitrant insurer.  This has

18  become even more important as each year that passes more Medicare

19  beneficiaries are opting for Medicare Part C.

8.      Compliance with the MSP Act should lead to tremendous savings for the Medicare program. In 2021, minimal compliance by primary payers resulted in approximately $9.7 bullion in savings. However, that's just the tip of the iceberg. According to an industry white paper, approximately 8 to 10% of all healthcare expenditures are related to some type of accident.[3] When a Medicare beneficiary is involved in an automobile accident, the beneficiary will almost always be insured for medical expenses either under the beneficiary's own auto insurance policy or under the policy of another driver. However, as authorized by the MSP Act, Medicare frequently ends up conditionally paying the privately covered medical expenses first. Accordingly, with expenditures over $700 billion, one should expect Medicare and MAOs to be able to recover at least something within range of 8% expenditures, which would amount to tens of billions of dollars. Recoveries, however, are not even remotely close to those amounts because auto insurers have systematically disregarded their duty to comply with their obligations under the MSP Act.[4]

---

[3] https://www.optum.com/content/dam/optum3/optum/en/resources/white-papers/StrengtheningPaymentIntegrity-SubrogtaionInjuryCoverageWhitePaper.pdf, p. 2 (last visited October 1, 2023).
[4] https://www.tucsonsentinel.com/opinion/report/043023_gonzales_medicare_op/gonzales-pursuing-more-insurance-reimbursements-would-bolster-medicare-funding/   (last   visited October 1, 2023) (opinion piece by Arizona State Senator Sally Gonzales observing that the insurance industry is "costing taxpayers billions yearly and putting Medicare at risk" and the MSP Act should be vigorously enforced "so that Medicare has the funding that it needs.").

9. Through years of investigation, including sending thousands of coordination of benefits letters to auto insurers across the country, Plaintiff has uncovered two strategies adopted by insurers that have contributed to the depletion of Medicare's trust funds by enabling insurers to evade their primary payer obligations. First, auto insurers, including Defendants, have done very little to identify or coordinate with MAOs who have made conditional payments, much less reimburse them. Those MAOs are ultimately funded from the same trust funds as Medicare.

10. Second, auto insurers, including Defendants, fail to properly report to Medicare their primary payer tatus and related information as mandated by Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007, PL 110-173 ("Section 111 reporting"). Through Section 111, on a quarterly basis, insurers are supposed to share data with Medicare that allows Medicare to determine whether it made a secondary payment that was in fact the responsibility of another insurer—the primary payer. However, auto insurers, including the Defendants, fail to gather the necessary Medicare information from the injured person or act on the data contained in bills sent to insurers by healthcare providers and, therefore, do not submit the information to Medicare as mandated by Section 111. This failure is either due to insurers,

1    including the Defendants, having flawed systems and faulty data or represents

2    a purposeful effort by them to hide the insurers' primary status from Medicare

3    and MAOs. Without a proper Section 111 report, Medicare—and ultimately

4    MAOs—frequently do not know that they are secondary payers and do not

5    know who the primary payer is.

6         11.    The auto insurers' strategies, including those of the Defendants,

7    have harmed and will continue to harm Medicare and MAOs across the

8    country. The Ninth Circuit in *DaVita Inc. v. Virginia Mason Mem'l Hosp.*, 981

9    F.3d 679, 692 (9th Cir. 2020), observed: "It may seem implausible today that

10   [an insurance] plan would blatantly contradict the MSP by asserting that

11   Medicare must pay first. But we note that, for decades, the sole purpose of the

12   MSP was to require private plans to pay first—a requirement that insurers

13   resisted and that Congress struggled to enforce." Even now, insurers like the

14   Defendants continue to resist.

15        12.    For that reason, this action seeks to enforce the MSP Act through

16   the Act's private cause of action—enacted specifically to overcome insurers'

17   resistance—by requiring the Defendants to do what the MSP Act Mandates:

18   identify and reimburse conditional payments made by one of the largest MAOs

19   in the country when Defendants were the primary payer. That MAO ("the MAO

1   assignor") assigned its conditional payment recovery rights to Plaintiff to bring

2   this action.

3                    **PARTIES, JURISDICTION, AND VENUE**

4          13.     Plaintiff Series 15-09-321 is a Delaware series limited liability

5   company with a principal place of business located at 2701 S. Le Jeune Road,

6   10th Floor, Coral Gables, Florida 33134. Series 15-09-321 is the ultimate

7   assignee of the MAO Assignor's rights to recovery.

8          14.     Defendant Farmers Insurance Exchange is an insurer that issues

9   liability and no-fault policies, with its principal place of business at 6301

10  Owensmouth Ave, Woodland Hills, California, United States. At all material

11  times, Farmers Insurance Exchange was and is authorized and licensed to

12  transact insurance in the State of California.

13

14         15.     Defendant Mid-Century Insurance Company is an insurer that

15  issues liability and no-fault policies, with its principal place of business at 6301

16  Owensmouth Ave, Woodland Hills, California, United States. At all material

17  times, Mid-Century Insurance Company was and is authorized and licensed to

18  transact insurance in the State of California.

19         16.     Defendant 21ˢᵗ Century Centennial Insurance Company is an

1   insurer that issues liability and no-fault policies, with its principal place of

2   business at 3 Beaver Valley Road, Wilmington, Delaware, United States. At all

3   material times, 21st Century Centennial Insurance Company was and is

4   authorized and licensed to transact insurance in the State of California.

5       17.    Defendant Foremost Insurance Company Grand Rapids, Michigan

6   is an insurer that issues liability and no-fault policies, with its principal place

7   of business at 5230 33RD St SE Grand Rapids, Michigan, United States. At all

8   material times, Foremost Insurance Company Grand Rapids, Michigan was and

9   is authorized and licensed to transact insurance in the State of California.

10      18.    Defendant Famers Insurance Company, Inc., is an insurer that

11  issues liability and no-fault policies, with its principal place of business at 6301

12  Owensmouth Ave, Woodland Hills, California, United States. At all material

13  times, Famers Insurance Company, Inc., was and is authorized and licensed to

14  transact insurance in the State of California.

15      19.    Defendant Farmers Insurance Company of Washington, is an

16  issuer that issues liability and no-fault policies. At all material times, Farmers

17  Insurance Company of Washington was and is authorized and licenses to

18  transact insurance in the State of California.

19      20.    This Court has jurisdiction over the subject matter of this action

1   under 28 U.S.C. § 1331.

2

3       21.    Venue is proper in this District pursuant to 28 U.S.C. §1391 (b),

4   (c), and (d) because at all times material hereto, Defendants resided, transacted

5   business, were found, or had agents in this District, and a substantial portion of

6   the alleged activity affecting trade and commerce discussed below has been

7   carried out in this District.

8       22.    This Court has personal jurisdiction over Defendants because

9   Defendants are at home in this forum, and personal jurisdiction over

10   Defendants does not offend traditional notions of fair play and substantial

11   justice.

12                 **THE MEDICARE ADVANTAGE PROGRAM**

13       23.    Medicare enrollees may elect to receive their benefits in own of

14   two ways. First, they may receive their benefits under the traditional Medicare

15   Parts A and B. Known as the Medicare "fee for service" option Parts A and B

16   provide hospital insurance and coverage for medically necessary outpatient and

17   physician services. 42 U.S.C. § 1395w-21(a)(1)(A). Under Parts A and B,

18   government contractors pay for Medicare enrollees' expenses directly on a fee-

19   for-service basis. Alternatively, under Medicare Part C, Medicare enrollees

1    may receive their Medicare benefits from private health insurers called

2    Medicare Advantage Organizations or MAOs. 42 U.S.C. § 1395w-21(a)(1)(B).

3         24.    Congress enacted the Part C "Medicare Advantage" option in

4    1997 after experts had come to realize that the Parts A and B "fee for service"

5    payment structure encouraged healthcare providers to order more tests and

6    procedures than medically necessary. Through Medicare Advantage, Congress

7    intended to "enable the Medicare program to utilize innovations that have

8    helped the private market contain costs and expand health care delivery

9    options." H.R. Rep. No. 105-217, at 585 (1997) (Conf. Rep.).

10

11        25.    Each MAO contracts individually with the Secretary of Health and

12   Human Services. 42 U.S.C. § 1395w-27. Under that contract, the MAO

13   receives a fixed amount per enrollee based on the plan's enrollees' risk factors

14   and other characteristics rather than payment of a fee for specific services

15   performed. The MAO must then provide at least the same level of benefits that

16   enrollees would receive under the fee-for-service Medicare Plan A and B

17   option. *See id.* at § 1395w-22. By paying MAOs a fixed amount per enrollee—

18   called a "capitation" payment system—Congress sought to safeguard public

19   dollars while improving the quality of care.

26.     Under a capitation-based system, the MAO provides Medicare benefits in exchange for the fixed monthly fee per person enrolled in the program regardless of actual healthcare usage. MAOs are thus incentivized to provide health insurance more efficiently than under the fee-for-service model. Not only does the Medicare Advantage program stimulate cost savings for the Medicare Trust Fund, but it also promotes creation of additional benefits for Medicare-eligible individuals: "[C]ost savings for the Medicare Trust Fund was not Congress's only goal when it created the MA program. Congress structured the program so that MAOs would compete for enrollees based on how efficiently they could provide care to Medicare-eligible individuals." *In re Avandia*, 685 F.3d at 365.

27.     Achievement of Congress's goals in enacting Medicare Advantage is, however, dependent on MAOs being able to achieve cost savings—like Medicare—through enforcement of the MSP Act by ensuring primary payers, such as the Defendants in this case, have reimbursed the MAOs for payments of medical expenses that should have been paid by the insurers who charged premiums specifically to cover those expenses. *In re Avandia*, 685 F.3d at 363. When MAOs achieve cost savings by recovering conditional payments from primary payers, they can bid to cover Medicare-eligible

1    individuals at an amount lower than CMS's benchmark, which then allows

2    CMS to deposit part of the savings into the Medicare Trust Fund. The MAOs'

3    which then allows CMS to deposit part of the savings into the Medicare Trust

4    Fund. The MAOs' cost savings also allow MAOs to offer "additional benefits

5    to enrollees not covered by traditional Medicare." *Id.* at 365. While conditional

6    payments recovered by MAOs do not go to Medicare directly, the payments by

7    primary payers do reduce costs, and those savings are passed on to Medicare

8    through reduced costs or to the beneficiaries through expanded services. *See* 42

9    U.S.C. § 1395w-23.

10        28.    Even though MAOs have parity of recovery rights with Medicare,

11   insurers such as the Defendants have—for more than two decades—continued

12   to disregard their reimbursement obligations to MAOs. That failure, which

13   blocks achievement of Congress' cost-saving goals, depletes the Medicare

14   Trust Funds that support Medicare Advantage under Part C—the same funds

15   supporting traditional Medicare under Parts A and B. 42 U.S.C. § 1395w-23(f).

16   Consequently, Congress's mandate that Medicare shall not be the entity

17   primarily footing the bill is still a long way from being realized. Litigation, such

18   as this, "ensuring that MAOs can recover from primary payers efficiently with

19   a private cause of action for double damages does indeed advance the goals of

1    the MA program." *In re Avandia*, 685 F.3d at 365.

2        29.    Achievement of Congress's goals in enacting Medicare

3    Advantage is, however, dependent on MAOs being able to achieve cost

4    savings—like Medicare—through enforcement of the MSP Act by ensuring

5    primary payers, such as the Defendants in this case, have reimbursed the MAOs

6    for payments of medical expenses that should have been paid by the insurers

7    who charged premiums specifically to cover those expenses. *In re Avandia*, 685

8    F.3d at 363. When MAOs achieve cost savings by recovering conditional

9    payments from primary payers, they can bid to cover Medicare-eligible

10   individuals at an amount lower than CMS's benchmark, which then allows

11   CMS to deposit part of the savings into the Medicare Trust Fund. The MAOs'

12   which then allows CMS to deposit part of the savings into the Medicare Trust

13   Fund. The MAOs' cost savings also allow MAOs to offer "additional benefits

14   to enrollees not covered by traditional Medicare." *Id.* at 365. While conditional

15   payments recovered by MAOs do not go to Medicare directly, the payments by

16   primary payers do reduce costs, and those savings are passed on to Medicare

17   through reduced costs or to the beneficiaries through expanded services. *See* 42

18   U.S.C. § 1395w-23.

19       30.    Even though MAOs have parity of recovery rights with Medicare,

1    insurers such as the Defendants have—for more than two decades—continued

2    to disregard their reimbursement obligations to MAOs. That failure, which

3    blocks achievement of Congress' cost-saving goals, depletes the Medicare

4    Trust Funds that support Medicare Advantage under Part C—the same funds

5    supporting traditional Medicare under Parts A and B. 42 U.S.C. § 1395w-23(f).

6    Consequently, Congress's mandate that Medicare shall not be the entity

7    primarily footing the bill is still a long way from being realized. Litigation, such

8    as this, ensures that MAOs can recover from primary payers efficiently to reach

9    the goals of the MA program.

10        31.    This litigation seeks to reconcile, in an accurate, structured, and

11   equitable way, claims for reimbursement Defendants have owed for years to

12   the MAO Assignor. This litigation thus effectively implements Congress's

13   original intent in passing the MSP Act.

14           **DEFENDANTS' DUTIES TO REPORT PRIMARY PAYER**

15                           **OBLIGATIONS**

16        32.    Defendants are property and casualty insurers in the business of

17   collecting premiums in exchange for taking on risk that they will have to pay

18   for personal and property damage resulting from covered events. Collectively,

19   Defendants offer insurance products in all 50 states and the District of

1  Columbia that have inevitably given rise to an MSP Act obligation to repay

2  conditional payments made by Plaintiff's MAO Assignor in those states. As a

3  result, Defendants are tasked with having the proper systems in place to be able

4  to (a) identify Medicare beneficiaries making claims under Defendants'

5  policies and (b) properly report them to CMS under section 111 as required by

6  law.

7      33.    Defendants underwrite automobile liability policies that include

8  first-party and third-party medical coverage. A first-party insurance policy

9  referred to the policy of the injured person. A third-party insurance policy refers

10  to the property and bodily injury policy covering the person or entity who was

11  responsible for the automobile accident. First-party medical coverage includes

12  Personal-Injury-Protection ("PIP") policies that are usually issued pursuant to

13  a state no-fault statute or provide Medical Payments Coverage ("MedPay")

14  found in a first-party policy. The first-party policy can also, and in most

15  instances does, contain bodily injury coverage. Third-party coverage includes

16  coverage under a third-party liability policy and coverage under the uninsured

17  motorist and/or underinsured motorist coverage provisions of a first-party

18  insurance policy. This coverage pays for medical expenses arising out of an

19  automobile accident that was the fault of a third party where the third party has

1    no coverage or insufficient coverage to pay the claims of the injured party.

2          34.    Defendants have primary payer obligations under the MSP Act to

3    reimburse MAOs such as Plaintiff's MAO Assignor for medical expenses

4    arising out of an automobile accident involving a Medicare beneficiary in three

5    general situations involving both first-party and third-party policies:

6        (1)    **<u>Contractual</u>**: When Defendants have a contractual obligation to

7                pay under a first-party policy such as for PIP or MedPay;

8

9

10      (2)    **<u>Settlement</u>**<u>: When Defendants settled a bodily injury claim made</u>

11               <u>against a third party under either a third-party liability policy or</u>

12               <u>under the uninsured or underinsured motorist coverage provisions</u>

13               <u>of a first-party policy; and</u>

14

15      (3)    **<u>Hybrid Situations</u>**<u>: Where an accident renders Defendants a</u>

16               <u>primary payer under both a contractual and a settlement-based</u>

17               <u>obligation, such as where an auto accident gives rise to claims</u>

18               <u>under both first-and third-party insurance policies.</u>

19    **A.**    **<u>First Party Policy Claims: First-Party Policy Medical</u>**

1        **Coverage**

2        35.    Defendants are primary payers when they have issued an

3    insurance policy that provides for first-party medical coverage that pays the

4    reasonable and necessary medical expenses that an insured (or a passenger)

5    incurred due to injuries sustained in an accident, regardless of fault. 42 U.S.C.

6    § 1395y(b)(2)(A). The type of first-party medical coverage varies state by state.

7    Some states require PIP coverage while other states provide for optional

8    MedPay coverage. A few states have both PIP and MedPay available.

9        36.    Although subject to change among the years at issue (and by no

10   means exhaustive), the following states currently have no-fault statutes

11   requiring mandatory PIP coverage:

12   • **Florida:** Florida Statute § 627.736 requires a minimum of

13   $10,000.00 in no-fault medical benefits per person;

14   • **Hawaii:** Hawaii Revised Statutes § 431:10C-103.5 requires

15   a minimum of $10,000.00 in no-fault medical benefits per

16   person;

17   • **Kansas:** Kansas Statutes § 40-3103 requires a minimum of

18   $4,500.00 in no-fault medical benefits per person;

19   • **Kentucky**: Kentucky Revised Statute § 304.39-020

1     requires a minimum of $10,000.00 in no-fault medical

2     benefits per person;

3     • **Massachusetts**: Massachusetts General Laws 90 § 34A

4     requires a minimum of $8,000.00 in no-fault benefits per

5     person;

6     • **Michigan**: Michigan Compiled Laws § 500.3107 requires

7     mandatory no-fault coverage at an amount to be selected by

8     the insured;

9     • **Minnesota**: Minnesota Statutes § 65B.44 requires a

10     minimum of $40,000.00 in no-fault medical benefits per

11     person;

12     • **New Jersey**: New Jersey § 39:6A-4.3 requires a minimum

13     of $15,000.00 in no-fault medical benefits per person;

14     • **New York**: 28 Consolidated Laws of New York § 5102

15     requires a minimum of $50,000.00 in no-fault benefits per

16     person;

17     • **North Dakota**: North Dakota Century Code § 26.1-41-01

18     requires a minimum of $30,000.00 in no-fault benefits per

19     person;

1
2
3

- **<u>Pennsylvania</u>**: 75 Pennsylvania Consolidated Statutes § 1711 requires a minimum of $5,000.00 in no-fault medical benefits per person; and

4
5

- **<u>Utah</u>**: Utah Code § 31A-22-307 requires a minimum of $3,000.00 in no-fault benefits per person;

6    37.    In addition, although Oregon is not a no-fault state, it requires
7    $15,000.00 per person in PIP medical benefits.

8    38.    In the remaining states (other than Oregon) that are considered "at-
9    fault" states because they do not have mandatory no-fault coverage, insureds in
10   some states have the option to purchase PIP coverage or some form of medical
11   payments coverage (such as in Arkansas, Maryland, South Dakota, Texas,
12   Virginia, and Washington). In all other states, they may purchase MedPay,
13   which also pay medical benefits regardless of who was at fault in the accident.
14   MedPay is mandatory in Maine ($2,000.00 in medical benefits) and in New
15   Hampshire if the New Hampshire resident purchases auto insurance, which is
16   not mandatory ($1,000.00 in medical benefits). In addition, Pennsylvania
17   allows individuals to opt out of no-fault insurance in which case the insured
18   must purchase $5,000.00 in MedPay coverage.

19   39.    For purposes of this Complaint, "First Party Policy Claims" will

1   refer to those instances in which the MAO Assignor made accident-related

2   conditional payments on behalf of a Medicare beneficiary that was also an

3   insured under a first-party policy that provided medical payments regardless of

4   fault such as PIP or MedPay.

5

6      **B.**     **Settlement Claims: Third-Party Bodily Injury Coverage**

7              **Where Defendants Settled A Liability Claim**

8

9      40.    When a Medicare beneficiary is injured in an accident that is the

10   responsibility of a third party, Defendants may be the insurer of the third party

11   or may be responsible under the Medicare beneficiary's own policy by virtue

12   of uninsured or underinsured motorist bodily injury policies ("UM" and "UIM"

13   policies). Defendants have no obligation to pay benefits under the third-party

14   policy or the UM/UIM policies unless the third party was "at fault."

15     41.    Although the most common types of policies where third-party

16   liability claims arise are bodily injury liability policies or UM/UIM policies,

17   third-party liability policies can also include umbrella coverage, which are

18   policies that may include coverage for medical expenses that the insured is

19   legally obligated to pay in excess of no-fault or medical-payments coverage,

1    bodily injury policy limits, or UM/UIM coverage.

2        42.    Under any of these policies, if Defendants choose to settle the

3    Medicare beneficiary's claims, including medical expenses, arising out of the

4    accident for which the third party was responsible or if a judgment or arbitration

5    award is entered in the Medicare beneficiary's favor with respect to claims

6    covered by Defendants' policy, then the Defendants are the responsible primary

7    payer under the MSP Act.

8        43.    For purposes of this Complaint, "Settlement Claims" refers to

9    those instances when the MAO Assignor made accident-related conditional

10   payments on behalf of a Medicare beneficiary who made a claim either against

11   a third-party liability policy or under the beneficiary's own UM/UIM coverage,

12   and Defendants' compromised that claim through a settlement, including

13   settlements arising out of a judgment or arbitration award or otherwise made a

14   payment that would be the functional equivalent of a settlement or judgment to

15   cover medical expenses incurred as a result of a specific incident or accident.

16       **C.**    **Defendants' Obligations Once They Become a Primary Payer**

17       44.    For both "First Party Policy Claims" and "Settlement Claims,"

18   Defendants are charged with two duties under the MSP Act: (1) to report its

19   primary payer status under Section 111, and (2) to reimburse Medicare within

1   60 days of receiving a primary payment. The primary plan "must reimburse

2   Medicare even though it has already reimbursed the beneficiary or other party."

3   42 U.S.C. § 1396y(b)(2)(B)(ii); 42 C.F.R. § 411.24(i)(1). If Defendants fail to

4   reimburse within 60 days, the MSP Act automatically gives rise to a right to

5   bring an action such as this one. In conjunction with these two duties, it is also

6   a   Primary   Payer's   obligation   to   identify   its   beneficiaries   who   are

7   simultaneously Medicare beneficiaries in order to report and reimburse in

8   accordance with the MSP Act.

9        45.     Section 111 amended the MSP Act to aid Medicare in the

10  detection of alternative sources of insurance coverage by requiring primary

11  plans—on their own initiative—to "determine whether a claimant (including

12  an individual whose claim is unresolved) is entitled to benefits under the

13  program under this subchapter on any basis"—i.e., including under Medicare

14  Advantage—and "if the claimant is determined to be so entitled," to report the

15  claim to the Secretary. 42 U.S.C. § 1395y(b)(8)(A)-(C).

16       46.     The insurer's Section 111 report must provide "notice about [its]

17  primary payment responsibility and information about the underlying MSP

18  situation" to the Medicare payer. 42 C.F.R. § 411.25.

19       47.     "The   notice   must   describe   the   specific   situation   and   the

1  circumstances (including the particular type of insurance coverage as specified

2  in § 411.20(a)) and, if appropriate, the time period during which the insurer is

3  primary to Medicare." *Id.* 42 C.F.R. § 411.25(a)-(c).

4      48.  Consequently, to submit a Section 111 report, an auto insurer like

5  Defendants must obtain certain data from the individuals making first- and

6  third-party insurance claims. The data that must be obtained and reported

7  includes:

8          • Medicare Beneficiary Information:

9                  ■ Beneficiary name, address, sex, and date of birth

10                  ■ Beneficiary health insurance claim number (i.e. Medicare

11                      beneficiary identification number or "HIC" number)

12                  ■ Social security number (if known)

13          • Medicare Claim Information

14                  ■ Date of accident, injury, or illness

15                  ■ Provider of service

16                  ■ Amount of Medicare payment (if known)

17                  ■ Date of Service

18                  ■ Date of Medicare payment (if known)

19

- Insurer, Employer, or Administrator Information:
    - Policyholder name and address
    - Name and address of insurer or administrator
    - Policy identification number or other identifier
    - Individual case identifiers used by third party payer (if applicable)
    - Name and phone number of insurer or administrator contact person
    - Workers' compensation agency claim number (if applicable)
    - Court case or docket numbers (if applicable)
    - Beneficiary's attorney's name, address, and phone number (if known and applicable)
    - Name, address, and phone number of employer
    - Date and amount of payment made by the insurer (specify whether undisputed payment, settlement of disputed claim, or judgment)
    - Whether, under the plan of insurance, payment was considered to be a primary or secondary payment

1        ▪ Payee name and address

2

3    *Medicare Program; Medicare Secondary Payment,* 59 Fed. Reg. 4285-01,

4    4287 (Jan. 31, 1994).

5        49.    More specifically, where Defendants accept coverage under a

6    first-party insurance policy—such as for PIP or MedPay coverage—

7    Defendants have what is called an Ongoing Responsibility for Medicals

8    ("ORM"). ORM is an entity's "responsibility to pay, on an ongoing basis, for

9    the injured party's (the Medicare beneficiary's) 'medicals' (medical care)

10   associated with a claim. Typically, ORM only applies to no-fault and workers'

11   compensation claims." CMS Section 111.1 NGHP User Guide, Chapter III,

12   Policy Guidance, Version 7.0, Chapter 2: Introduction and Important Terms;

13   *see also* Chapter 6: Responsible Reporting Entities § 6.3.

14       50.    On the other hand, when Defendants settle an accident-related

15   claim based on third-party liability with someone entitled to Medicare benefits,

16   it has what is called a Total Payment Obligation to the Claimant ("TPOC").

17   The CMS Section 111 NGHP User Guide states that a TPOC "refers to the

18   dollar amount of a settlement, judgment, award, or other payment in addition

19   to or apart from ORM. A TPOC generally reflects a 'one-time' or 'lump-sum'

1  settlement, judgment, award, or other payment intended to resolve or partially

2  resolve a claim. It is the dollar amount of the total payment obligation to, or on

3  behalf of the injured party in connection with the settlement, judgment, award,

4  or other payment." Chapter III: Policy Guidance, Version 7.0, Chapter 2:

5  Introduction and Important Terms; *see also* Chapter 6: Responsible Reporting

6  Entities § 6.4.

7      51.    When Defendants have either ORM or TPOC, it is a "Responsible

8  Reporting Entity" or "RRE" under federal law and are required to submit a

9  Section 111 report. To submit the report, Defendants must first query the

10  Medicare eligibility database to determine whether the claimant is a Medicare

11  beneficiary. CMS's Benefits Coordination & Recovery Center ("BCRC")

12  gives reporting entities two query methods. Because of Defendants' size, they

13  must submit requests using a "Query Input File" that will be answered in

14  fourteen days.

15      52.    When uploading a Query Input File with the BCRC to determine

16  whether a claimant is a Medicare beneficiary, the query record submitted for

17  each claimant must contain five data elements related to the claimant: (1) Social

18  Security Number ("SSN") or Medicare ID; (2) the first 6 characters of the

19  claimant's last name; (3) the first initial of the claimant's first name; (4) the

claimant's date of birth; and (5) the claimant's gender. Names must be submitted exactly as they appear on the individual's Social Security or Medicare card, including spaces, hyphens, and apostrophes. *Id.* at 26.

53.     These five pieces of information are *required* to determine a claimant's entitlement to Medicare benefits and must be gathered by Defendants for submission to the BCRC.[5] CMS requires all five of the data elements because "the matching process depends on the quality of the data submitted. It is difficult to get a match if the input data is incorrect or invalid."[6]

54.     For the BCRC to find a match in the Medicare database, there must be an exact match on either: (1) the Medicare ID or the full SSN, and three out of the four remaining fields; or (2) the partial SSN (last five digits) and all four remaining fields. Thus, when fewer than three out of the last four criteria match (i.e., the first initial of the first name, first six characters of the last name, date of birth, and gender), the RRE will not receive a match even if the submitted Medicare ID or SSN in fact matches that of a Medicare beneficiary.

---

[5] CMS, MMSEA Section 111 Liability Insurance (including Self-Insurance), No-Fault Insurance, and Workers' Compensation, Query File, January 9, 2023, page 23.
[6] *Id.* at 25.

1      55.     If that claimant is indeed a Medicare beneficiary, Defendants must

2   provide Section 111 report to CMS "*after* the claim is resolved [by Defendants]

3   through a settlement, judgment, award, or other payment (regardless of whether

4   or not there is a determination or admission of liability)." 42 U.S.C. §

5   1395y(b)(8)(A)(ii) (emphasis added). In other words, once Defendants enter

6   into a settlement with or make a payment to or on behalf of a Medicare-eligible

7   beneficiary (and not before), it must file the mandatory Section 111 report.

8      56.     By making a payment on behalf of or entering into a settlement

9   with a Medicare beneficiary in connection with the Medicare beneficiary's

10  accident-related claim, Defendants demonstrate it is the "primary plan" as to

11  that claim. A primary plan must reimburse Medicare or MAOs for their

12  conditional payments when it is demonstrated that the primary plan has or had

13  responsibility to make payment with respect to such item or service, a primary

14  plan's responsibility for payment may be shown by a judgment, a payment

15  conditioned upon the recipient's compromise, waiver, or release (whether or

16  not there is a determination or admission of liability) of payment for items or

17  services included in a claim against the primary plan or the primary plan's

18  insured.

19  **DEFENDANTS' FAILURE TO COMPLY WITH THE MSP ACT**

57.     For numerous years, and continuing through the present, Defendants' have failed to comply with its duty to gather the necessary information from the claimants to enable it to submit all the required data elements to CMS so that it can identify for Defendants those claimants entitled to Medicare benefits. This habitual failure frequently results in Defendants making no Section 111 submission at all. When Defendants fail to make a Section 111 report, Medicare and MAOs do not have the requisite information needed to identify a primary payer and to seek reimbursements for conditional payments.

58.     Upon information and belief, Defendants track their compliance with Section 111 through periodic audits conducted to evaluate their success at collecting and submitting complete data sets for claimants.

59.     Upon information and belief, the audit reports show Defendants fail to consistently comply with Section 111. Upon further information and belief, those reports are shared with Defendants' upper management and establish Defendants' knowledge that they do not fully comply with their duties to identify Medicare beneficiaries and, as a result, fail to reimburse claims conditionally paid by Medicare or MAOs.

60.     Defendants' failure to obtain the necessary data points to

1   determine a claimant's Medicare eligibility, whether intentional or

2   unintentional, results in significant under-reporting and, correspondingly, the

3   inability of Medicare or MAOs to uncover all the instances in which

4   Defendants owe reimbursement of conditional payments. Defendants are aware

5   of their obligations under the MSP Act to "determine whether a claimant

6   (including an individual whose claim is unresolved) is entitled to benefits under

7   the program bunder this subchapter on any basis," and has access to the

8   necessary data to make this determination. In fact, in most instances,

9   Defendants have the requisite data points in their systems to make this

10  determination and report their primary payer status pursuant to Section 111 and,

11  to the degree they do not, are aware of their affirmative statutory duty to obtain

12  that information.

13       61.    Upon information and belief, Defendants fail to properly report

14  hundreds of reimbursable claims nationwide. Plaintiff compared the claims

15  data it received from its MAO Assignor to publicly available motor vehicle

16  accident reports to identify instances where Medicare beneficiaries appear to

17  have been involved in crashes. Plaintiff then took that pool of beneficiaries and

18  compared them to Section 111 reports made by Defendants. Upon completion

19  of that comparison, there are numerous instances where, upon information and

1   belief, it appears Defendants either completely failed to report reimbursable

2   claims or withdrew a prematurely filed report.

3   **DEFENDANTS' FAILURE TO COORDINATE BENEFITS OR**

4   **COOPERATE WITH PLAINTIFF'S ATTEMPT TO COORDINATE**

5   **BENEFITS**

6

7        62.    Even though Defendants, as a primary payer, bear the

8   responsibility for coordinating benefits and identifying whether Medicare or

9   any MAO is entitled to reimbursement of conditional payments, Plaintiff

10  attempted, prior to bringing this lawsuit, to work with Defendants to identify

11  conditional payments made by Plaintiff's MAO Assignor that Defendants

12  should have reimbursed. Plaintiff, through its servicer, sent out coordination of

13  benefits letters via certified mail to Defendants and devoted a tremendous

14  amount of manpower and resources to try to work with Defendants to resolve

15  each letter. The letters related to both First Party Policy Claims and Settlement

16  Claims.

17       63.    Plaintiff identified Defendants as the likely primary payer for the

18  conditional payments reflected in these letters based on reports that Defendants

19  made under Section 111. Plaintiff accesses the Section 111 reports through a

1   CMS-authorized vendor called MyAbility. MyAbility's data is drawn directly

2   from data submitted by Defendants to CMS, either itself or through a reporting

3   vendor Defendants hired. Accordingly, any inaccuracy or lack of specificity in

4   the data is attributable to Defendants.

5        64.    Defendants responded to 540 letters, for an 86% response rate. For

6   many of those responses, Defendants either refused to provide any information

7   that would allow the parties to coordinate benefits as the law requires, or

8   Defendants denied that it had any responsibility based on purported legal

9   defenses that have no basis in law or fact.

10       65.    For the First-Party Policy Claims, Plaintiff attempted to

11  coordinate benefits for at least 361 instances in which Defendants reported

12  under Section 111 having made a payment based on the existence of a first-

13  party insurance policy.  Those claims corresponded with payments made by

14  Plaintiff's MAO Assignor on behalf of Medicare beneficiaries that resided in

15  33 different states. The top 10 states with the number of claims made in those

16  states are as follows:

| First Party Claims | |
|---|---|
| **State** | **Count** |
| FL | 100 |

| | |
|---|---|
| NY | 55 |
| NJ | 31 |
| UT | 31 |
| TX | 25 |
| IN | 19 |
| PA | 11 |
| TN | 10 |
| WA | 9 |
| NC | 12 |

66.     For the Settlement Claims, Plaintiff attempted to coordinate benefits for 267 instances in which Defendants acknowledged in a Section 111 filing that it had entered into a settlement with Medicare beneficiary enrolled with the MAO Assignor under a third-party insurance policy or UM/UIM. Those claims corresponded with payments made by Plaintiff's MAO Assignor Plan on behalf of Medicare beneficiaries that resided in 33 different states. The top 10 states with their total number of beneficiaries are as follows:

**Third Party Claims**

| State | Count |
|-------|-------|
| TX | 40 |
| TN | 20 |
| WA | 20 |
| MO | 16 |
| OR | 14 |
| CA | 12 |
| GA | 12 |
| NM | 12 |
| CO | 11 |
| IN | 11 |

67. Plaintiff devoted significant resources in its attempt to coordinate benefits with Defendants and to avoid litigation. Plaintiff has no choice but to bring this action because its comprehensive and exhaustive efforts to coordinate and work with the Defendants outside of litigation have been unsuccessful. In fact, in their responses to Plaintiff's correspondence, Defendants have habitually stonewalled Plaintiff's effort to coordinate benefits with improper defenses to properly compensable claims. The table below summaries Defendants' responses to Plaintiff's efforts to coordinate benefits:

| Accepting Settlement Offer | 2 |
|----------------------------|---|

| | |
|---|---|
| Allege Worker's Compensation Policy | 1 |
| Alleging Litigation | 929 |
| Beneficiary did not report injuries | 4 |
| Confirmed Settlement | 156 |
| Contact Attorney Only | 899 |
| Contesting Billed Amount | 4 |
| Contesting Double Damages | 1 |
| Contesting MSP Assignment & Failed To Provide Assignment of Benefits | 2 |
| Contesting Relatedness | 7 |
| Different Date of Accident | 1 |
| Disclosed Beneficiary Attorney | 141 |
| Disclosed First Party Insurer | 5 |
| Disclosed Third Party Insurer | 1 |
| Duplicate Claims | 1 |
| E2MSP Reply | 2 |
| Exhaustion | 21 |

| | |
|---|---|
| Failed to attach itemized bill | 67 |
| Failed to provide proper claim-policy number | 12 |
| Failed to send to proper address | 2 |
| First Party Insurer Claim Open | 2 |
| First Party Insurer made payment | 3 |
| Ins Company Allege Not Medicare Beneficiary | 1 |
| Member Not Covered | 32 |
| Notice of Pending Settlement | 1 |
| Privileged Communication | 1 |
| Provided CMS Information | 3 |
| Received Full Payment | 4 |
| Received Partial Payment | 10 |
| Received Response to MSP Demand | 72 |
| Requested Additional Extension Past 30 Days | 1 |
| Requesting Extension | 1 |
| Settlement Negotiation | 2 |
| Statute of Limitations | 18 |

| | |
|---|---|
| Stop Payment Notice | 7 |
| Subro Closing Notification | 12 |
| Subrogation (Paid Lien) | 8 |
| Third Party Insurer Claim Open | 9 |
| Third Party Insurer Did Not Accept Liability | 23 |
| Unable to Access Portal | 1 |
| Unable to Locate Claim-Insured | 216 |

68.     Defendants also refused to share any data with Plaintiff for the purpose of identifying situations where Defendants were a primary payer but did not submit a Section 111 report—a process that numerous other carriers have agreed to explore outside of litigation. Defendants' actions in refusing to coordinate benefits are purposeful and designed to continue to conceal details of its primary payer responsibility when it has failed to submit a Section 111 report.

69.     Through this action, Plaintiff seeks to identify all instances in which Defendants had a primary payer responsibility to reimburse accident-related conditional payments made by Plaintiff's MAO Assignor. The most

1    efficient and fair way to quantify those damages is through a process that

2    resembles what several other carriers are already doing voluntarily. To identify

3    undetected claims for primary payers *other than* Defendants, Plaintiff has

4    engaged in data sharing exercises with those other primary payers, who are also

5    property and casualty insurers, in which the parties match data to identify all

6    the instances in which a MAO made payments that overlap with first- or third-

7    party claim made to the insurer by a Medicare beneficiary enrolled with the

8    MAO. This process uses matching techniques that compensate for missing data

9    and data imperfections and is consistent with Congress's intention in enacting

10   the MSP Act to ensure that Medicare and, ultimately, MAOs (Part C plans) are

11   repaid in *all instances* where an insurer is primary.[7]

---

[7] *See, e.g.,* **(1) Allstate Insurance Company** (*MSPA Claims 1, LLC v. Allstate Ins. Co.*, Case No. 1:17-cv-01340, D.E. 169 (N.D. Ill. Mar. 8, 2022)) (no-fault settlement exploration through data sharing); *MSP Recovery Claims 1, LLC v. Allstate Ins. Co.*, Case No. 20-cv-24140 at Dkt. No. 70 (S.D. Fla. 2020)) (bodily injury settlement exploration through data sharing), **(2) Auto-Owners Insurance Company** (*MSP Recovery Claims, Series LLC v. Auto-Owners Ins. Co.*, Case No. 17-cv-23841 at Dkt. No. 143 (S.D. Fla. 2022)) (settlement exploration through data sharing and noting in the joint report requesting dismissal that "[t]he parties believe that the best opportunity to finally resolve their disputes will be to continue engaging in a data matching process agreed to by the parties" and "this exercise is a reconciliation that be handled by the parties outside of litigation"); **(3) National General Insurance Company** (*MSP Recovery Claims, Series LLC, et al. v. Integon Nat. Ins. Co., et al.*, Case No. 20-cv-24051, D.E. 147 (S.D. Fla. 2022)) (settlement exploration through data sharing), **(4) Sentry Insurance Company** *MSP Recovery Claims, Series LLC v. Dairyland Ins. Co.*, Case No. 17-cv-23983 at Dkt. No. 91 (S.D. Fla. 2020)) (no-fault and bodily injury settlement exploration through data sharing); **(5) Grange Insurance Company** (*MSP Recovery Claims, Series LLC v. Grange Ins. Co.*, Case No. 19-cv-219 at Dkt. No. 36 (N.D. Ohio 2019)) (noting in joint report that Grange agreed to "engage in a defined claims data

1              **STANDING ALLEGATIONS**

2    **A.    Assignment Allegations**

3         70.    Plaintiff has the legal right to pursue its MSP Act claim pursuant

4    to a valid assignment agreement.[8]

5         71.    On December 23, 2021, Plaintiff's MAO Assignor entered into a

6    Claims Assignment Agreement with Series 15-09-321, whereby the MAO

7    Assignor irrevocably assigned all rights to recover payments made on behalf of

8    its members/enrollees (the "2021 Assignment Agreement"). The 2021

9    Assignment Agreement expressly provides, in pertinent part:

10         Assignor irrevocably assigns, transfers, conveys, sets over and

11         delivers to Assignee any and all of Assignor's right, title,

---

matching process" to explore settlement, which resulted in a global settlement); **(6) Esurance Insurance Services, Inc** (*MSP Recovery Claims Series, LLC v. Esurance Property and Casualty Co.*, Case No. 20-cv-23590 at Dkt. No. 50 (S.D. Fla. 2020)) (no-fault and bodily injury settlement exploration through data sharing); **(7) Amica Mutual Insurance Company** (*MSP Recovery Claims, Series LLC v. Amica Mut. Ins. Co.*, Case No. 20-cv-24050, D.E. 42 (S.D. Fla. May 6, 2022)) (settlement exploration through data sharing); **(8) Horace Mann Insurance Company** *MSP Recovery Claims, Series LLC v. Horace Mann Ins. Co.*, Case No. 20-cv-24419, Dkt. No. 40 (S.D. Fla. July 9, 2021)) (global settlement reached based on data sharing); **(9) 1199 SEIU National Benefit and Pension Funds** (*MSP Recovery, LLC v. 1199 SEIU Nat'l Benefit and Pension Funds*, Case No. 20-cv-1480) (global settlement reached following data sharing).

[8] A separate data service agreement with Plaintiff's MAO Assignor contains a provision requiring that the identity of the Assignor remain confidential. Accordingly, Plaintiff has omitted the name of its assignor from this Complaint. Accordingly, Plaintiff has omitted the name of its assignor from this Complaint. Should the Court deem it necessary, Plaintiff will disclose its MAO Assignor's identity, but would request that the identity be disclosed under seal.

1    ownership, and interest in Medicare Advantage Parts A, B, and C

2    payments owed by Responsible Parties pursuant to the MSPA, by

3    and through the following causes of action: (1) actions stemming

4    from the MSPA; (2) breach of contract; (3) pure bills of discovery

5    or equivalent; (4) depositions or discovery before action as set

6    forth by Federal Rule of Civil Procedure 27; (5) subrogation; (6)

7    declaratory action; (7) unjust enrichment, whether known or

8    unknown, or arising in the future (the "Claims").

9

10   2021 Assignment Agreement at 1.1.1.

11        72.    Consideration was exchanged by the parties in executing the 2021

12   Assignment and the data service agreement.

13        73.    The "Claims" expressly exclude claims where the MAO Assignor

14   already recovered on the claim or is currently pursuing the claim.

15        74.    The MAO Assignor transferred data files to Plaintiff indicating

16   those claims where it already had recovered money and those claims where the

17   MAO Assignor is still pursuing recoveries. Plaintiff reviewed that list prior to

18   filing this case and conferred with the Assignor, in an abundance of caution, to

19   confirm that the assignor (1) never recovered money for the examples set forth

1   below and (2) is not pursuing recoveries for the examples below. Accordingly,

2   these examples remain unpursued and unreimbursed, and not excluded, and

3   Plaintiff have the legal right to pursue these claims.

4       75.    The claims set forth in this Complaint are not subject to any

5   carveout, exclusion, or any other limitation in law or equity that would impair

6   Plaintiff's right to bring the claim asserted in this case.

7       76.    This Complaint seeks recovery only for claims Plaintiff's assignor

8   has assigned to Plaintiff through its Designated Series (Series 15-09-321). All

9   claims at issue in this Complaint, and all claims data currently in Plaintiff's

10   possession, were assigned to Plaintiff through the 2021 Assignment

11   Agreement. Indeed, Plaintiff has possession of the electronic claims data for

12   each example of non-reimbursement identified in this Complaint solely

13   because Plaintiff's Assignor provided that data to Plaintiff pursuant to the 2021

14   Assignment Agreement.

15

16

17   **<u>Examples Of Unreimbursed First Party Policy Party Claims</u>**

18   **<u>And Settlement Claims</u>**

19

77.     Defendants, by failing to comply with the MSP Act and reimburse Plaintiff's MAO Assignor for conditional payments, has caused monetary injury to Plaintiff's MAO Assignor sufficient to establish a concrete injury in fact under Article III. Despite very little cooperation from Defendants, Plaintiff has identified from data transferred to it by the MAO Assignor and further investigation several examples of Defendants' failure to comply the MSP Act.

78.     Adhering to how CMS identifies instances of non-reimbursed conditional payments, Plaintiff analyzed the MAO Assignor's enrollment and claims data to identify situations where: (1) the MAO Assignor had a Medicare beneficiary enrollee injured in an accident, (2) Defendants filed a Section 111 report regarding that enrollee, (3) the MAO Assignor made accident-related payments on behalf of that enrollee, and (4) Defendants failed to reimburse the MAO Assignor's conditional payments. Plaintiff confirmed that Defendants either acknowledged that the enrollee was covered by Defendants or that Defendants had entered into a settlement with the enrollee arising out of the accident.

79.     Specifically, CMS uses what is reported through Section 111 to identify whether any claims that Medicare either receives or pays are related to an automobile accident. https://www.cms.gov/files/document/mmsea-111-

1   august-7-2023-nghp-user-guide-version-73-chapter-iv-technical-

2   information.pdf at Section 6.2.5 (last visited October 1, 2023). CMS requires

3   the Section 111 report to contain certain codes (called International

4   Classification of Diseases, Ninth/Tenth Revision, Clinical Modification (ICD-

5   9/ICD-10) that describe the "alleged illness, injury, or incident claims and/or

6   released by the settlement, judgment, or award, or for which ORM [under a

7   first-party coverage] is assumed." *Id*. "The ICD-9/ICD-10 codes are used by

8   Medicare to identify claims Medicare may receive, related to the incident, for

9   Medicare claims payment and recovery purposes." *Id*

10       80.    CMS provides to reporting entities, such as Defendants, a list of

11  valid    ICD    codes,    and    that    list    can    be    accessed    here:

12  https://www.cms.gov/medicare/coordination-benefits-recovery-overview/icd-

13  code-lists (last visited October 1, 2023). The list is segregated into those codes

14  that are "valid" versus those that are "excluded." "Certain codes are not valid

15  for No-Fault insurance types . . . because they are not related to the accident,

16  and may result in inappropriately denied claims." *Id*. For all the examples of

17  un-reimbursed secondary payments set forth in, each of the accident-related

18  payments that the MAO Assignor made on behalf of the Medicare beneficiary

19  fall within the list of "valid" codes that CMS itself looks at when initiating

1    recovery. In other words, CMS, as an initial matter, would consider as accident-

2    related all the payments set forth below that the MAO Assignor made related

3    to the accident.

4          81.     Moreover, with respect to the injuries that Defendants reported

5    under Section 111, all the injuries contained within Defendants' Section 111

6    reports reflect injuries that are identical, or very similar, to the injuries that

7    resulted in health care providers providing medical items and services to the

8    MAO enrollee and thereafter billing and collecting from the MAO Assignor.

9    CMS's manual states that it would hold Defendants responsible for reimbursing

10    Medicare for any payments that Medicare made for same or similar injuries.[9]

11    In fact, CMS issued a training manual for reporting entities such as Defendants,

12    stating that "ICD Diagnosis codes are also important for claims recovery"

13    because "if [Defendants] [have] assumed ORM for a beneficiary's broken

14    collar bone injury due to a no-fault policy claim, the Commercial Repayment

15    Center (CRC) will use the submitted ICD diagnosis codes to search Medicare

16    records for claims paid by Medicare that are related to the case."[10]

---

[9] https://www.cms.gov/files/document/mmsea-111-august-7-2023-nghp-user-guide-version-73-chapter-iv-technical-information.pdf at Section 6.2.5 (last visited October 1, 2023).

[10] https://www.cms.gov/Medicare/Coordination-of-Benefits-and-Recovery/Mandatory-Insurer-Reporting-For-Non-Group-Health-Plans/NGHP-Training-

1      82.     Further, according to the CMS manual: "If Medicare has made

2   primary or conditional payment on claims related to the incident that should

3   have been paid by other insurance, the CRC will pursue recovery from the

4   insurer for the Medicare benefits paid." *Id*. Medicare likewise would hold

5   Defendants accountable for reimbursing any Medicare payments for injuries

6   that resulted in the settlement of a third-party liability claim. For example, if

7   Defendants reported that it settled a claim involving injuries such as a sprain of

8   the neck and a sprain of the ankle, Medicare "will use this information to search

9   Medicare claims history," "identify any claims paid primary . . . that relate to

10  the neck and ankle sprains," and pursue recovery. *Id*. "An exact match on the

11  submitted ICD-9 diagnosis codes . . . is not required." *Id*. As noted above and

12  reflected below, all the injuries that Plaintiff identified are either identical, or

13  very similar, to what Defendants reported in their Section 111 reports.

14      83.     Additionally, for each of the examples, Plaintiff confirmed that

15  Defendants either acknowledged that the enrollee was covered by a Defendants

16  policy or that Defendants had entered into a settlement with the enrollee arising

17  out of the accident. Defendants also knew or should have known that its insured

---

Material/Downloads/ICD-Diagnosis-Code-Requirements-Part-I.pdf at p. 7 (last visited
August 8, 2023).

1    was a Medicare beneficiary and therefore had constructive knowledge of its

2    duty to reimburse the MAO Assignor.

3        84.    The following examples of First Party Policy Claims and

4    Settlement Claims illustrate Defendants' failure to fulfill their statutory duties

5    to reimburse the MAO Assignor for conditional payments when it knew that

6    the individuals making Defendants' insurance claims were also entitled to

7    Medicare benefits. The representative Medicare beneficiaries listed below

8    (identified by initials for confidentiality reasons) are illustrative examples of

9    the many claims Defendants have failed to reimburse.

10       85.    The scope of Plaintiff's claims is not limited to the represented

11   beneficiaries listed below. Plaintiff's claims seek reimbursement and other

12   relief for the thousands of conditional payments that to date remain

13   unreimbursed by Defendants.

14       86.    The examples below detail the facts that demonstrate (1) the MAO

15   Assignor made conditional payments for treatment to address injuries caused

16   by an auto accident; (2) a Defendant was a primary plan with respect to that

17   accident; (3) a Defendant had a demonstrated responsibility to pay or reimburse

18   the MAO Assignor's conditional payments; and (4) a Defendant did not

19   reimburse the MAO Assignor for its conditional payments, causing the MAO

1    Assignor to sustain damages. For each claim below, the MAO Assignor

2    executed an assignment to Plaintiff allowing Plaintiff to pursue the specific

3    recovery of damages; the MAO Assignor did not retain any reimbursement

4    rights; and Plaintiff satisfied all conditions precedent (to the extent any exist)

5    to bring these claims.

6                        **First Party Policy Claims Examples**

7        85.    L.G. was injured in an automobile accident on January 26, 2017.

8    At that time, L.G. was enrolled in Plaintiff's MAO Assignor's MA Plan.

9            a.    At the time of the accident, L.G. was insured by a

10                Mid-Century Insurance Company no-fault policy

11                having policy number 0191628724.

12            b.    On the date of the accident, L.G. sustained lower

13                back and chest injuries, causing L.G. to suffer

14                Dorsalgia (lower back pain) and chest pain.

15            c.    Two days later, L.G. visited the emergency room at

16                the Hartford Hospital in Hartford, Connecticut and

17                received treatment for the accident injuries from

18                physician assistant Nicholas Wayne Chasse and

19                Radiology Dr. Angabeen S. Khan.

d.    The auto accident caused the injuries set forth above.

e.    Treatment of L.G.'s lower back and chest injuries was reasonable and necessary.

f.    L.G.'s medical providers billed the MAO Assignor $1,679.44 for the above accident-related treatment and the MAO Assignor paid $466.18 for treatment of L.G.'s accident-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the accident-related treatments, are on the list of valid CMS codes. Moreover, the MAO Assignor paid for treatment of accident injuries that are either the same as, or similar to, the injuries that Mid-Century Insurance Company reported pursuant to Section 111.

g.    Mid-Century Insurance Company's Section 111 report for L.G. admits the following details about the claims:

i.    L.G. was insured by Mid-Century Insurance Company.

1               ii.      The accident caused L.G. to suffer Dorsalgia

2                      (lower back pain) and chest pain.

3              iii.     L.G's Medicare coverage was secondary, and

4                      L.G.'s Mid-Century Insurance Company's

5                      No-Fault Auto Insurance was primary.

6              iv.     The Plan name was Farmers Insurance.

7    86.     J.P. was injured on April 29, 2019. At that time, J.P. was

8  enrolled in Plaintiff's MAO Assignor's MA Plan.

9                   a. At the time of the accident Foremost

10                   Insurance Company Grand Rapids,

11                   Michigan insured Business Atkinson Real

12                   Estate Investment with policy number

13                   5000859974 that included a no-fault

14                   coverage policy.

15       b.    On the date of the accident, J.P. sustained hip and

16              knee injuries, causing J.P. to suffer pain in right hip

17              and bilateral primary osteoarthritis of the knee.

18       c.    The same day of the accident, J.P. visited the

19              Watertown Regional Medical Center, Wisconsin and

1                received treatment for the accident injuries from

2                Radiology Dr. Brian T Lipman and nurse practitioner

3                Dana M. Stinnet.

4      d.     The accident caused the injuries set forth above.

5      e.     Treatment of J.P.'s hip and knee injuries was

6                reasonable and necessary.

7      f.     J.P.'s medical providers billed the MAO Assignor

8                $451.00 for the above accident-related treatment and

9                the MAO Assignor paid $115.10 for treatment of

10               J.P.'s accident-related injuries. The diagnosis codes

11               contained within the medical bills from the medical

12               providers, relating to the accident-related treatments,

13               are on the list of valid CMS codes. Moreover, the

14               MAO Assignor paid for treatment of accident injuries

15               that are either the same as, or similar to, the injuries

16               that Foremost Insurance Company Grand Rapids,

17               Michigan reported pursuant to Section 111.

18      g.    Foremost Insurance Company Grand Rapids,

19               Michigan's Section 111 report for J.P. admits the

1    following details about the claims:

2        v.    The accident caused J.P. to suffer pain in

3            unspecified knee.

4        vi.    J.P.'s Medicare coverage was secondary, and

5            Foremost Insurance Company Grand Rapids,

6            Michigan's No-Fault Insurance was primary.

7        vii.    The Plan name was National Document

8            Center.

9        viii.    The insured is Business Atkinson Real Estate

10           Investment.

11       ix.    The insured policy number is 5000859974.

12   87. J.P.2. was injured in an automobile accident on July 04, 2018. At that

13       time, J.P.2. was enrolled in Plaintiff's MAO Assignor's MA Plan.

14       a.    On the day of the accident, J.P.2. was waiting for

15           another vehicle in front of her while in the drive-

16           through of a Walmart Pharmacy when she was hit

17           from behind. J.P.2. informed the officer that took

18           down her statement for the Traffic Collision Report

19           that "her chest was hurt[] from hitting the steering

1          wheel."

2     b.   At the time of the accident, J.P.2. was insured by a

3          Farmers Insurance Company, Inc., under a no-

4          fault/MedPay policy with the policy number

5          0186658318.

6     c.   On the date of the accident, J.P.2. sustained cervical

7          and lung injuries, causing J.P.2. to suffer Cervicalgia

8          (neck pain) and other disorders of lung.

9     d.   The same day as the accident, J.P.2. visited Norman

10         Regional Moore, Oklahoma and received treatment

11         for the accident injuries from physician Gautam

12         Dehadrai, associate of NRHS Radiology Associates.

13    e.   The auto accident caused the injuries set forth above.

14    f.   Treatment of J.P.2.'s cervical and lung injuries was

15         reasonable and necessary.

16    g.   J.P.2.'s medical providers billed the MAO Assignor

17         $77.00 for the above accident-related treatment and

18         the MAO Assignor paid $22.23 for treatment of

19         J.P.2.'s accident-related injuries. The diagnosis codes

1                          contained within the medical bills from the medical

2                          providers, relating to the accident-related treatments,

3                          are on the list of valid CMS codes. Moreover, the

4                          MAO Assignor paid for treatment of accident injuries

5                          that are either the same as, or similar to, the injuries

6                          that Farmers Insurance Company, Inc. reported

7                          pursuant to Section 111.

8        h.      Farmers Insurance Company, Inc's Section 111

9                          report for J.P.2. admits the following details about the

10                        claims:

11            i.      J.P.2. was insured by Farmers Insurance

12                          Company, Inc.

13           ii.     The accident caused J.P.2. to suffer sprain of

14                          ligaments of cervical spine.

15           iii.    J.P.2.'s Medicare coverage was secondary,

16                          and J.P.2.'s Farmers Insurance Company,

17                          Inc.'s No-Fault Auto Insurance was primary.

18           iv.    The Plan name was National Document

19                          Center.

1    88.    The plan or contract number was 0186658318.K.K. was injured in

2    an automobile accident on March 21, 2019. At that time, K.K. was enrolled in

3    Plaintiff's MAO Assignor's MA Plan.

4         a.    At the time of the accident, K.K. was insured by a

5            Farmers Insurance Company, Inc., liability policy

6            having policy number 0192153210.

7         b.    The incident caused K.K to suffer injuries to: his

8            right wrist, hand and finger(s); chest pain, contusion

9            of unspecified front wall of thorax; and localized

10           edema.

11        c.    The same day of the accident, K.K. received

12           treatment for the accident injuries from advanced

13           nurse practitioner Carolyn Marley, Dr. Mark

14           Newport, Dr. Jordan Anthony Chance, and Dr. Julie

15           Alford.

16        d.    The auto accident caused the injuries set forth above.

17        e.    Treatment of K.K.'s right wrist, hand and finger(s);

18           chest pain, contusion of unspecified front wall of

19           thorax, and localized edema injuries was reasonable

1   and necessary.

2   f.   K.K.'s medical providers billed the MAO Assignor

3        $316.00 for the above accident-related treatment and

4        the MAO Assignor paid $84.72 for treatment of

5        K.K.'s accident-related injuries. The diagnosis codes

6        contained within the medical bills from the medical

7        providers, relating to the accident-related treatments,

8        are on the list of valid CMS codes. Moreover, the

9        MAO Assignor paid for treatment of accident injuries

10       that are either the same as, or similar to, the injuries

11       that Farmers Insurance Company, Inc. reported

12       pursuant to Section 111.

13  g.   Farmers Insurance Company, Inc.'s Section 111

14       report for K.K. admits the following details about the

15       claims:

16       i.   K.K. was insured by Farmers Insurance

17  Company, Inc.

18       ii.   The accident cause K.K. to suffer injuries of

19       unspecified wrist, hand and finger(s) an injury of

1    thorax.

2              iii.    K.K.'s Medicare coverage was secondary, and

3        K.K.'s Farmers Insurance Company, Inc's liability

4        insurance was primary.

5              iv.    The Plan name was Farmers Insurance

6        Company.

7                        **Settlement Claims Examples**

8        87.    When Defendants enter into a settlement agreement with an

9    injured party who is enrolled in a Medicare plan, Defendants become primary

10   payers that are responsible for reimbursement of medical services rendered to

11   the injured party. After executing settlement agreements in each instance

12   identified below, Defendants failed to provide actual notice of its primary payer

13   status to the Medicare participants who paid for the beneficiaries' medical

14   expenses and failed to reimburse the MAO Assignor for its conditional

15   payments.

16       88.    J.F. was injured in an automobile accident on September 14, 2018,

17   near **Pahrump, Nevada**. At that time, J.F. was enrolled in Plaintiff's MAO

18   Assignor's MA Plan.

19              a.    The Farmers' insureds responsible for the September

1    14, 2018. incident were C.B. and L.B. Farmers

2    Insurance Exchange, in response to Series 15-09-

3    321's coordination of benefits letter, disclosed that

4    C.B. and L.B. were insured by it under Policy

5    number: 0317539143.[11]

6    b.    The incident caused J.F. to suffer an injury to the

7         shoulder and upper arm; more specifically, a

8         puncture wound without foreign body of the right

9         forearm, and an open bite of J.F.'s right shoulder.

10   c.    J.F. was transported on September 14, 2018, by the

11        Pahrump Valley Fire Rescue and received treatment,

12        at the Desert View Hospital ("DVH") in **Pahrump,**

13        **Nevada** on that day and the following.

14   d.    Follow-up outpatient treatment related to these

15        injuries continued on September 17, 2018, October 9,

16        2018, October 24, 2018, and November 5, 2018.

17   e.    The incident caused the injuries set forth above.

18   f.    Treatment of J.F.'s right forearm and shoulder was

---

[11] Farmers Insurance Exchange reported to CMS with the Claim Number: 3011579591-1-2, instead of with the Policy Number it later disclosed.

1    reasonable and necessary.

2    g.    J.F.'s medical providers billed the MAO Assignor

3          $14,460.79 for the above accident-related treatment

4          and the MAO Assignor paid $2490.30 for treatment

5          of J.F.'s incident-related injuries. The diagnosis

6          codes contained within the medical bills from the

7          medical providers, relating to the incident-related

8          treatments, are on the list of valid CMS codes.

9          Moreover, the MAO Assignor paid for treatment of

10         incident injuries that are either the same as, or similar

11         to, the injuries that Farmers Insurance Exchange

12         reported pursuant to Section 111.

13   h.    J.F. filed a third-party claim against C.B. and L.B.'s

14         bodily injury policy, seeking as damages

15         reimbursement of medical expenses incurred by the

16         MAO Assignor for the incident-related injuries set

17         forth above.

18   i.    Farmers Insurance Exchange entered into a

19         settlement with J.F. on 2019, with respect to this

1  third-party bodily injury claim, arising from the

2  incident on September 14, 2018.

3  j.  Farmers Insurance Exchange paid J.F. $215,000 in

4  exchange for a release of all claims arising out of the

5  September 14, 2018 incident, including the claim for

6  reimbursement of medical expenses resulting from

7  the incident.

8  k.  Farmers Insurance Exchange's Section 111 report for

9  J.F. admits the following details about the claims:

10  i.  The settling party was Farmers Insurance

11  Exchange's insured.

12  ii.  The incident caused J.F. to suffer an

13  unspecified injury to the shoulder and upper

14  arm (unspecified arm); and unspecified injury

15  of unspecified forearm. Further, the settlement

16  agreement released J.F.'s claim for medical

17  expenses relating to these injuries.

18  iii.  J.F.'s Medicare coverage was secondary, and

19  the liability insurance was primary.

iv.     Despite the settling party being insured by Farmers Insurance Exchange the applicable Plan name reported was Farmers Insurance Company.

89.    L.J. was injured in a traffic accident, on August 1, 2019, at Steve Reynolds Blvd and Redgate Road, **Gwinnett County, Georgia**. At that time, L.J. was enrolled in Plaintiff's MAO Assignor's MA Plan

l.     The Farmers' insured responsible for the August 1, 2019, traffic accident was N.D. Farmer's entity Mid-Century Insurance Company, in response to Series 15-09-321's coordination of benefits letter, disclosed that N.D. was insured by it under Policy number: 0187388324.[12]

m.     The traffic accident collision caused L.J. to suffer injuries including, but not limited to: unspecified injury of neck; cervicalgia (neck pain); unspecified injury of shoulder and upper arm (unspecified arm); unspecified injury of unspecified forearm;

---

[12] Mid-Century Insurance Company reported to CMS this liability primary payer responsibility under Contract/Plan Number: 030.

1          unspecified injury of unspecified hip; pain in right

2          hip; low back pain; unspecified injury of unspecified

3          lower leg; and unspecified injury of unspecified foot.

4     n.   L.J.'s doctor noted that L.J.'s outpatient office visit,

5          examination, and treatment on August 5, 2019, was

6          due to a traffic accident collision with a nonmotor

7          vehicle, while L.J. was driving a car.

8     o.   The auto accident caused the injuries set forth above.

9     p.   Treatment of L.J's neck, lower back, and hip injuries

10         were reasonable and necessary.

11    q.   L.J.'s medical provider billed the MAO Assignor

12         $180.00 for the above accident-related treatment and

13         the MAO Assignor paid $86.59 for treatment of

14         L.W.'s accident-related injuries. The diagnosis codes

15         contained within the medical bill from the medical

16         provider, relating to the accident-related treatments,

17         are on the list of valid CMS codes. Moreover, the

18         MAO Assignor paid for treatment of accident injuries

19         that are either the same as, or similar to, the injuries

1          that Farmers reported pursuant to Section 111.

2     r.    L.J. filed a third-party claim against N.D.'s bodily

3          injury policy, seeking as damages reimbursement of

4          medical expenses incurred by the MAO Assignor for

5          the accident-related injuries set forth above.

6     s.    Mid-Century Insurance Company settled the bodily

7          injury claim on December 8, 2021, paying L.J..

8          $16,800.00 in exchange for a release of claims

9          against N.D., arising out of the August 1, 2019,

10         accident.

11    t.    Mid-Century Insurance Company's Section 111

12         report for L.J. admits the following details about the

13         claims:

14         i.    The settling party was Mid-Century Insurance

15              Company's insured.

16         ii.   The auto accident caused L.J. to suffer

17              unspecified injury of neck; unspecified injury

18              of unspecified hip; low back pain; unspecified

19              injury of shoulder and upper arm (unspecified

1       arm); unspecified injury of unspecified

2       forearm; unspecified injury of unspecified

3       lower leg; and unspecified injury of

4       unspecified foot. Further, the settlement

5       agreement released L.J.'s claim for medical

6       expenses relating to these injuries.

7          iii.   L.J.'s Medicare coverage was secondary, and

8       the liability insurance was primary.

9          iv.   The Plan name was Farmers Insurance

10      Company.

11   90.   M.A. was injured in an automobile accident on January 11, 2017.

12   At that time, M.A. was enrolled in Plaintiff's MAO Assignor's MA Plan.

13      a.   The Farmers' insured responsible for the January 11,

14      2017 automobile accident was L.B. Farmer's entity

15      21st Century Centennial Insurance Co., in response

16      to Series 15-09-321's coordination of benefits letter,

17      disclosed that L.B. was insured by it under Policy

1      number: 0020362824.[13]

2      b.    The auto accident caused M.A. to suffer injuries

3            including, but not limited to: sprain of joints and

4            ligaments of other parts of neck, pain in right knee,

5            and low back pain.

6      c.    M.A. received treatment at Newark Beth Israel

7            Medical Center ("NBIMC") in **Newark, New**

8            **Jersey**, for the knee and lumbar injuries, during an

9            outpatient office visit, on January 20, 2017.

10     d.    Treatments to M.A. in the outpatient visit included

11           M.A.'s evaluation and management by an internal

12           medicine doctor, as well as three x–ray images of

13           M.A.'s right knee and four x-ray images of M.A.'s

14           lumbosacral spine, taken at the NBIMC Department

15           of Radiology and informed by a Radiology doctor.

16     e.    The auto accident caused the injuries set forth above.

17     f.    Treatment of M.A.'s right knee and lumbosacral

---

[13] 21st Century Centennial Insurance Co. reported to CMS with this same Contract/Plan Number: 0020362824.

1                spine injuries was reasonable and necessary.

2      g.     M.A.'s medical providers billed the MAO Assignor

3                $1,864.00 for the above accident-related treatment

4                and the MAO Assignor paid $240.13 for treatment of

5                M.A's accident-related injuries. The diagnosis codes

6                contained within the medical bills from the medical

7                providers, relating to the accident-related treatments,

8                are on the list of valid CMS codes. Moreover, the

9                MAO Assignor paid for treatment of accident injuries

10              that are either the same as, or similar to, the injuries

11              that 21st Century Centennial Insurance Co. reported

12              pursuant to Section 111.

13     h.     M.A. filed a third-party claim against the bodily

14              injury policy of 21st Century Centennial Insurance

15              Co. insured, seeking as damages reimbursement of

16              medical expenses incurred by the MAO Assignor for

17              the accident-related injuries set forth above.

18     i.      21st Century Centennial Insurance Co.  settled the

19              bodily injury claim on an undisclosed date, in

1                    exchange for a release of claims against Farmers

2                    insured, arising out of the January 20, 2017 accident.

3           j.     21st Century Centennial Insurance Co.'s Section 111

4                    report for M.A. admits the following details about the

5                    claims:

6              i.     The settling party was Farmers' insured.

7             ii.    The auto accident caused M.A. to suffer sprain

8                    of joints and ligaments of other parts of neck.

9                    Further, the settlement agreement released

10                  M.A.'s claim for medical expenses relating to

11                  these injuries.

12            iii.   M.A.'s Medicare coverage was secondary, and

13                  the liability insurance was primary.

14            iv.   The Plan name was National Document Center

15                  with a Farmers' address.

16     91.   P.W. was injured in an automobile accident on March 17, 2017,

17 near Everett, WA. At that time, P.W. was enrolled in Plaintiff's MAO

18 Assignor's MA Plan.

19         a.    The Farmers Insurance Company of Washington

insured responsible for the March 17, 2017, accident was G.C. Farmers Insurance Company of Washington, in response to Series 15-09-321's coordination of benefits letter, disclosed that G.C. was insured by Farmers Insurance Company of Washington under Policy number: 0186172516.[14]

b. The motor-vehicle accident in traffic caused P.W. to suffer an unspecified injury of the neck; strain of muscle, fascia and tendon at neck level; strain of muscle, fascia and tendon of lower back; dorsalgia; and strain of other muscles, fascia and tendons at shoulder and upper arm level, in unspecified arm.

c. P.W. was treated for these accident-related injuries on March 17, 2017, at The Everett Clinic, PLLC in Everett, WA, by physician assistant Jody Friday. At the office visit to the clinic, P.W was subjected to X-rays of the neck and lumbosacral spine areas.

---

[14] Defendant reported to CMS with the Claim Number: 3008268540, instead of with the Policy Number it later disclosed and the claim number missing last digits (3008268540-**1-3**).

d.  The accident caused the injuries set forth above.

e.  Treatment of P.W.'s neck and lumbosacral spine areas was reasonable and necessary.

f.  P.W.'s medical provider billed the MAO Assignor $415.75 for the above accident-related treatment and the MAO Assignor paid $175.21 for treatment of P.W.'s accident-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the accident-related treatments, are on the list of valid CMS codes. Moreover, the MAO Assignor paid for treatment of accident injuries that are either the same as, or similar to, the injuries that Farmers Insurance Company of Washington reported pursuant to Section 111.

g.  P.W. filed a third-party claim against G.C.'s bodily injury policy, seeking as damages reimbursement of medical expenses incurred by the MAO Assignor for the accident-related injuries set forth above.

1         h.     Farmers entered into a settlement with P.W.[15] on an

2                  unknown date and for an unknown amount, with

3                  respect to this third-party bodily injury claim, arising

4                  from the accident on March 17, 2017.

5         i.      In response to Plaintiff's attempts to Coordinate

6                  Benefits, Farmers Insurance Company of

7                  Washington delivered a check on June 29, 2023, in

8                  the amount of $415.75 to Series 15-09-321. Despite

9                  Farmers Insurance Company of Washington issuing

10                payment in the amount Plaintiff demanded to resolve

11                the claim, Farmers Insurance Company of

12                Washington issued a stop payment on July 31, 2023

13                on the check.

14        j.      Farmers Insurance Company of Washington's

15                Section 111 report for P.W. admits the following

16                details about the claims:

17            i.    The settling party was Farmers Insurance

---

[15] Farmer Insurance Company of Washington reported to CMS insurance type: "Medicare Secondary, Other Liability Insurance is Primary.".

1          Company of Washington's insured.

2      ii.      The accident caused P.W. to suffer dorsalgia

3              and an unspecified injury to the neck. Further,

4              the settlement agreement released P.W.'s

5              claim for medical expenses relating to these

6              injuries.

7      iii.     P.W.'s Medicare coverage was secondary, and

8              the liability insurance was primary.

9      iv.      The applicable Plan name was Farmers

10             Insurance.

11  92.    The cross-referencing exercise Plaintiff undertook to identify the above

12  examples is successful in identifying some unreimbursed conditional

13  payments. However, the bulk of those payments remain hidden without

14  cooperation by The Defendants. Since the Defendants have been unwilling to

15  comply with its Congressionally-mandated obligations to determine when it is

16  a primary plan under the MSP Act and ensure that it has reimbursed all

17  conditional payments, this litigation is necessary to ensure current and future

18  compliance with the MSP Act. There can be little doubt that the examples

19  alleged above are merely the tip of the iceberg, and that thousands of other

instances exist in which the Defendants has accepted premiums to cover medical expenses arising out of automobile accidents but has chosen to let Medicare and MAOs pick up the tab.

93.     The Defendants refusal to accept their Congressionally-mandated obligation to reimburse MAOs' conditional payments—instead pocketing premiums charged to cover the expenses it lets the MAOs pay—has led to this lawsuit.

**DEFENDANTS       FAILED       TO       CONTEST       THE**

**REIMBURSEMENT CLAIM**

**UNDER THE EXCLUSIVE ADMINISTRATIVE REVIEW PROCESS**

**UNDER 42 U.S.C. §§ 405(G)-(H)**

94.     When a party wants to dispute a claim by an MA plan, it must do so through the exclusive review process outlined in 42 U.S.C. 405(g) and 405(h). Section § 405(h) makes § 405(g), the Social Security program's judicial review provision, the sole avenue for judicial review of all claims arising under the Medicare Act.

95.     When an MAO gets billed for medical expenses incurred by its beneficiary after an injury in an incident, the MAO determines: (1) whether

1    those expenses are covered under the health insurance policy; and, if so, (2) how

2    much to pay. 42 C.F.R. § 422.566(b).

3        96.    The MAO's initial decision regarding coverage for a Medicare

4    enrollee's medical expenses is called an "organization determination," which

5    includes any reimbursement determination made by an MAO with respect to

6    payment made by an MAO for Medicare covered services. 42 C.F.R §

7    422.566(b)(3).

8        97.    If any party wishes to challenge any aspect of an organization

9    determination, that party must exhaust its administrative remedies by

10   following a specific procedure for administrative appeal prescribed by the

11   Medicare Act and its implementing regulations. 42 U.S.C. § 1395w–22(g); 42

12   C.F.R. §§ 422.560–422.622.

13       98.    Defendants failed to challenge MSP and the MAO Assignors'

14   organization determination under the administrative process in 42 U.S.C.

15   405(g), and as a result, it is foreclosed from disputing the reimbursement

16   amounts in this lawsuit, as no party timely appealed the MAO Assignors'

17   organization determination (i.e., reimbursement determination).

18       99.    Thus, the amount Defendants owe is now fixed as to the universe

19   of claims asserted in this action.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Equitable Estoppel

100.   Defendants have been under a continuous duty to identify and coordinate benefits with MAOs, including the MAO Assignor, and to provide proper notice to CMS of its primary payer status to ensure that conditional payments made on behalf of Medicare beneficiaries are reimbursed.

101.   Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded their obligations to the MAO Assignor and, therefore, are estopped from relying on any statute of limitations in defense of this action.

### Fraudulent Concealment

102.   All applicable statutes of limitation have been tolled by Defendants' fraudulent concealment of its status as the primary payer for the MAO Assignor's Medicare beneficiary enrollees by: (1) intentionally failing to obtain the information needed to identify whether individuals with accident-related medical expenses covered by Defendants' policies are Medicare beneficiaries enrolled in Medicare Advantage Plans, (2) failing to properly submit Section 111 reports to CMS, and (3) failing to coordinate with MAOs or their assignors in order to evade having to reimburse conditional payments. Instead of complying with the requirements of the MSP Act and Section 111,

1    enacted to ensure that Medicare and now MAOs are secondary payers,

2    Defendants have intentionally and fraudulently concealed its primary payer

3    responsibility to avoid having to reimburse conditional payments.

4        103.    Virtually all residents in the United States are covered under

5    multiple policies of insurance. These policies include health, prescription, auto,

6    and home insurance coverage. Although the enrollment process for these

7    policies varies between carriers and policy types, certain features are common.

8        104.    Auto insurers, including Defendants, ask numerous questions

9    about the insured during policy underwriting such as the policy holder's name,

10    address, date of birth, vehicle make and model, education level, employment

11    information, driving history, vehicle registration, license information, accident

12    history, and whether the insured resides with individuals of driving age.

13        105.    Thus, when an insured makes a claim, the claim is then assigned

14    to a claim handler to be processed through a standardized process. One of the

15    steps in the process is to determine—for the first time—whether the claimant

16    is Medicare eligible. Often, the claim adjuster will rely solely on responses to

17    written forms sent to insureds, where the insureds will self-report whether they

18    are Medicare eligible or will provide certain demographic information so the

19    auto insurer can query Medicare's database. However, insureds are reluctant to

1    turn over information which results in Defendants' failure to identify and

2    reimburse payments made by Medicare Advantage Organizations.

3        106.   Moreover, throughout the life of a claim, the claim handler

4    receives additional information from other third-party sources, such as

5    examinations under oath, police records, medical bills, and the like.

6    Defendants, however, have no process in place to extract information from

7    those third-party sources and use that information to either query the Medicare

8    eligibility database or to investigate further to learn of the insured's Part C

9    provider. This too results in missed opportunities to identify and reimburse

10   Medicare Advantage Organizations, including the MAO Assignor in this case.

11       107.   Defendants know their current system is set up to result in large

12   amounts of conditional payments being undetectable. They are undetectable

13   because the MSP statute and implementing regulations rely on compliance by

14   the auto insurer to make secondary payers, i.e., Medicare or MAOs, aware of

15   the fact that someone has a primary payment responsibility. Indeed, Section

16   111 and 42 C.F.R. § 411.25 were specifically designed so that auto insurers

17   come forth with information to facilitate the coordination of benefits and

18   reimbursement of payments owed to Medicare.

19       108.   Defendants' choice not to change its system and processes to

1    result in accurate and complete coordination between itself and Medicare and

2    MAOs amounts to fraudulent concealment that tolls the statute of limitations

3    for all claims that Plaintiff or its MAO Assignor were unable to discover due

4    to Defendant's fraud.

5          109.   Defendants may register as an RRE for itself or for any direct

6    subsidiary in its corporate structure.[16]  Further, a parent company (regardless

7    of whether it fits the formal definition of an RRE) may register as an RRE for

8    any subsidiary in its corporate structure.[17]  Accordingly, any of Defendants'

9    subsidiaries may also be liable to Plaintiff, as illustrated by the labyrinthine

10   organizational chart attached hereto as **Exhibit 1.**

11         110.   As further evidence of Defendant's concealment of information,

---

[16] MMSEA Section 111 Liability Insurance (Including Self-Insurance), No-Fault Insurance, and
Workers' Compensation User Guide, *available at*
https://www.cms.gov/Medicare/Coordinationof-Benefits-and-Recovery/Mandatory-Insurer-Reporting-For-Non-Group-Health-Plans/NGHPTraining-Material/Downloads/Responsible-Reporting-Entity.pdf; *see* CMS, Mandatory Insurer Reporting for Non-Group Health Plans (NGHP),
https://www.cms.gov/Medicare/Coordinationof-Benefits-and-Recovery/Mandatory-Insurer-Reporting-For-Non-Group-Health-Plans/Overview.html.
[17] MMSEA Section 111 Liability Insurance (Including Self-Insurance), No-Fault Insurance, and
Workers' Compensation User Guide, *available at*
https://www.cms.gov/Medicare/Coordinationof-Benefits-and-Recovery/Mandatory-Insurer-Reporting-For-Non-Group-Health-Plans/NGHPTraining-Material/Downloads/Responsible-Reporting-Entity.pdf.

1  in violation of federal law, Plaintiff attempted to coordinate benefits solely on

2  those claims that Plaintiff could identify from reports that Defendants made

3  under Section 111. As described above and below, Plaintiff sent hundreds of

4  letters to better understand whether Defendants fulfilled their obligation to

5  reimburse Plaintiff's MAO Assignor. Instead of cooperating and providing

6  information as the law requires, Defendants refused to provide information as

7  discussed in paragraph 66, *supra*.

8       111.  In fact, for the first-party and third-party examples above,

9  Defendants ignored Plaintiff's requests to coordinate benefits—failing to

10  provide any response whatsoever.

11      112.  None of these reasons are valid reasons to refuse to provide

12  information pursuant to Section 411.25. Instead, they reflect conduct that

13  amounts to fraudulent concealment of information that Defendants are required

14  to disclose and that concealment tolls the statute of limitations to the extent

15  Plaintiff was unable to identify an actionable claim because of Defendants'

16  conduct.

17                          **<u>Class Action Tolling</u>**

18      113.  Any applicable statute of limitations was tolled during the

19  pendency of a prior class action.

114.   Specifically, the claims made in this action were tolled by the pendency of *MAO-MSO Recovery II, LLC et al v. The Farmers Insurance Exchange et al.*, 2:17-cv-02522, in the Central District of California, filed on March 31, 2017.

115.   Plaintiff seeks to opt out of any pending class action and is now entitled to bring all claims relating back to the filing of the above-mentioned class action.

## CAUSES OF ACTION

## COUNT I

**Private Cause of Action Under 42 U.S.C. § 1395y(b)(3)(A) for Settlement Claims**

**(Seeking the MAO Assignor's Unreimbursed Conditional Payments)**

116.   Plaintiff re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1-111 as if fully set forth herein.

117.   Plaintiff asserts a private cause of action pursuant to 42 U.S.C. § 1395y(b)(3)(A).

118.   Defendants were a primary plan for the Settlement Claims.

119.   Plaintiff's MAO Assignor, as part of providing Medicare benefits under the Medicare Advantage program, paid for accident-related items and services that were reasonable and necessary and which were also covered by a third-party policy that provided bodily injury coverage for accident-related medical expenses or by a first-party policy that provided UM or UIM coverage.

120.   The MAO's Medicare beneficiaries made claims against Defendants' third-party policies to recover the medical expenses the MAO Assignor paid for items and services that were reasonable, necessary, and related to an accident. Defendants entered into settlements with the MAO Assignor's beneficiaries relating to accidents but failed to reimburse the MAO Assignor for accident-related medical expenses paid by the Assignor.

121.   Defendants had a nondelegable duty to reimburse the MAO Assignor for payments it made for medical expenses related to an accident. Defendants are responsible for reimbursement of these accident-related medical expenses, even if it subsequently paid out the maximum benefits under the policies.

122.   Defendants have and had a demonstrated responsibility to reimburse accident-related secondary payments relating to the Settlement Claims by failed to do so causing Plaintiff's MAO Assignor damages.

1  Defendants' responsibility to reimburse the MAO Assignor for its Settlement

2  Claims conditional payments is demonstrated by the fact that Defendants

3  entered into settlements with respect to the accidents with MAO Assignor's

4  enrollees.

5      123.  To the extent it was necessary, Defendants failed to

6  administratively appeal the MAO Assignor's rights to reimbursement within

7  the administrative remedies period. Defendants, therefore, are time-barred from

8  challenging the propriety, reasonableness, and necessity of the amounts paid.

9      124.  Defendants were required to timely reimburse the MAO Assignor

10  for conditional payments of its Medicare beneficiaries' accident-related

11  medical expenses.

12      125.  Defendants derived substantial monetary benefit by placing the

13  burden of financing medical treatments on the MAO Assignor in violation of

14  the MSP Act and to the detriment of the Medicare program.

15      126.  Plaintiff seeks to recoup only those medical items or services

16  provided to the MAO Assignor's Medicare beneficiary enrollees that were

17  related to motor vehicle accidents covered by Defendants' insurance policies.

18      127.  Plaintiff brings this claim pursuant to 42 U.S.C. § 1395y(b)(3)(A),

19  for reimbursement of its MAO Assignor's secondary payments and to recover

1   statutory double damages from Defendants for their failure to make appropriate

2   and timely reimbursement of conditional payments for Medicare beneficiaries'

3   accident-related medical expenses.

4   **COUNT II**

5   **Private Cause of Action Under 42 U.S.C. § 1395y(b)(3)(A) for First-Party**

6   **Claims**

7   **(Seeking the MAO Assignor's Unreimbursed Conditional Payments)**

8

9   128.   Plaintiff re-alleges and incorporates herein by reference each of

10   the allegations contained in the preceding paragraphs 1-111 as if fully set forth

11   herein.

12   129.   Plaintiff asserts a private cause of action pursuant to 42 U.S.C. §

13   1395y(b)(3)(A).

14   130.   Defendants were the primary plan for the First-Party Claims.

15   131.   Defendants have a demonstrated responsibility to reimburse

16   accident-related secondary payments relating to the First-Party Claims but

17   failed to do so.

18   132.   With respect to the First Party Policy Claims, the MAO Assignor,

19   while providing Medicare benefits under the Medicare Advantage program,

1   paid for accident-related medical items and services that were reasonable and

2   necessary and that were also covered by no-fault, PIP, or MedPay policies

3   issued by Defendants that provided medical coverage for accident-related

4   medical expenses. The MAO Assignor's payments were conditional payments.

5        133.   Defendants' responsibility to reimburse the MAO Assignor for its

6   First Party Claims conditional payments is demonstrated by either the issuance

7   of the policy providing coverage of the MAO Assignor's enrollees or by

8   Defendants assuming ongoing responsibility for the medical expenses of the

9   MAO Assignor's enrollee arising out of the accident.

10       134.   Because Defendants were a primary payer—as established by the

11  insurance policy or payment of one or more medical expenses or items—

12  Defendants had a nondelegable duty with respect to the First Party Policy

13  Claims to reimburse the MAO Assignor for accident-related medical expenses

14  paid by the MAO Assignor

15       135.   Defendants were required to timely reimburse the MAO Assignor

16  for conditional payments of its Medicare beneficiaries' accident-related

17  medical expenses.

18       136.   The MAO Assignor suffered damages as a direct result of

19  Defendants' failure to comply with its statutory and regulatory duties under the

1    MSP Act and the corresponding regulations within the Code of Federal

2    Regulations.

3        137.   Defendants derived substantial monetary benefit by placing the

4    burden of financing medical treatments on the MAO Assignor in violation of

5    the MSP Act and to the detriment of the Medicare program.

6        138.   To the extent it was necessary, Defendants failed to

7    administratively appeal the MAO Assignor's rights to reimbursement within

8    the administrative remedies period. Defendants are, therefore, time-barred from

9    challenging the propriety, reasonableness, and necessity of the amounts paid.

10       139.   Plaintiff seeks to recoup only those medical items or services

11   provided to the MAO Assignor's Medicare beneficiary enrollees that were

12   related to motor vehicle accidents covered by Defendants' insurance policies.

13

14

15                             **COUNT III**

16   **Breach of Contract for Failure to Pay Benefits for the Contractual**

17                               **Claims**

18   **(Seeking the MAO Assignor's Unreimbursed Conditional Payments)**

19

1    140.   Plaintiff re-alleges and incorporates herein by reference each of

2    the allegations contained in the preceding paragraphs 1-111 as if fully set

3    forth herein.

4    141.   Plaintiff alleges certain claims here by way of subrogation.

5    142.   At all material times, the MAO Assignor provided health

6    insurance to Medicare beneficiaries, including those set forth in the examples

7    above.

8    143.   The MAO Assignor is subrogated to the right to recover from

9    Defendants, in all instances in which Defendants are a primary plan, for

10   Defendants' failure to make primary payment or reimbursement to the MAO

11   Assignor for accident-related medical expenses.

12   144.   The MAO Assignor paid for its enrolled Medicare beneficiaries'

13   accident-related medical expenses in amounts to be proven at trial, pursuant to

14   its agreements with CMS.

15   145.   Defendants failed or refused to make primary payments of no-

16   fault insurance benefits, or medical-payment benefits, as it was obligated to do.

17   146.   Defendants' failure to pay or make timely reimbursement for the

18   MAO Assignor's enrolled Medicare beneficiaries' accident-related medical

19   expenses has caused the MAO Assignor damages, as set forth here, in amounts

1  to be proven at trial.

2

3      147.  To the extent necessary and not otherwise preempted by federal

4  statute or regulation, Plaintiff complied with all applicable conditions

5  precedent to the institution of this claim for reimbursement.

6      148.  For the First Party Claims, including those where Defendants

7  issued policies in states where no-fault coverage is mandatory, as well as states

8  where first-party medical coverage is optional, Defendants had a contractual

9  obligation to pay benefits under a first-party policy that covered medical

10  expenses.

11  **COUNT IV**

12  **<u>Fraudulent Concealment</u>**

13

14      149.  Plaintiff re-alleges and incorporates herein by reference each of

15  the allegations contained in the preceding paragraphs 1-111 as if fully set

16  forth herein.

17      150.  As described above, Plaintiff and its MAO Assignor's ability to

18  identify and recover secondary payments is only as good as Defendants'

19  compliance with its duty to report its primary payer status, as required by

1    federal law.

2         151.   Based on the claims information reported to CMS under Section

3    111, Plaintiff identified instances in which Defendants failed to properly

4    reimburse on reported claims.

5         152.   In addition, on information and belief, Plaintiff alleges

6    Defendants have not and cannot report all claims because it deliberately

7    designed and operates a claim adjusting system that results in repeated,

8    systematic failures to disclose its primary payer status for all first party policy

9    claims and settlement claims as is its duty under the MSP Act and its

10   implementing regulations.

11        153.   For all First Party Policy claims and Settlement claims,

12   Defendants' duty is to disclose information about its primary payer status to

13   CMS, for the benefit of Medicare and, by extension, MAOs such as Plaintiff's

14   MAO Assignor.

15        154.   Defendants' primary payer status and the fact it acted as the first-

16   party insurer or settled a liability claim under a third-party policy are pieces of

17   information known and/or accessible only to Defendants, because they

18   possessed exclusive and/or superior knowledge as to such facts. Moreover,

19   Defendants knew these facts were not known to or reasonably discoverable by

1   Plaintiff or its MAO Assignor.

2      155.   By virtue of its repeated, systematic failure to report its primary

3   payer status when it acted as the first-party insurer or settled a liability claim

4   under a third-party policy, Defendants knowingly and/or recklessly concealed

5   this information breaching the duty prescribed to it under the MSP Act and its

6   implementing regulations.

7      156.   Defendants' knowing and/or reckless concealment of its primary

8   payer status by means of failure to report under Section 111 is a breach of duty

9   separate and distinct from its failure to properly reimburse under the MSP Act

10  and its implementing regulations.

11     157.   Plaintiff and its MAO assignor were unaware of the concealed

12  material facts relating to Defendants' primary payer status for unreported First

13  Party Policy and Settlement Claims and Plaintiff and its MAO Assignor would

14  not have acted as they did if they had known Defendants were a primary payer

15  for the unreported First Party Policy and Settlement Claims.

16     158.   Specifically, Plaintiff's MAO Assignor would not have made any

17  secondary payments if Defendants had properly disclosed primary payer status

18  before Plaintiff's MAO Assignor paid. Moreover, Plaintiff would have timely

19  pursued reimbursement against Defendants, through issuance of a demand

1   letter, had Defendants not concealed its primary payer status from Plaintiff and

2   its MAO Assignor. Plaintiff through its MAO Assignor justifiably relied on the

3   absence of a Section 111 report when making secondary payments on the

4   unreported first party policy and settlement claims.

5       159.   Because the omission of the material fact that Defendants were a

6   primary payer for the unreported First Party Policy and Settlement Claims,

7   Plaintiff and its MAO Assignor sustained damages when the MAO Assignor

8   paid for items and services that were the responsibility of Defendants. Had

9   Plaintiff and its MAO Assignor known of the facts Defendants knowingly

10  and/or recklessly concealed, Plaintiff's MAO Assignor would not have paid for

11  items and services that were the responsibility of Defendants. In addition, even

12  in instances where Plaintiff's MAO Assignor made such payments, Plaintiff

13  would have timely pursued reimbursement against Defendants.

14                          **COUNT V**

15      **Declaratory Relief Pursuant to 28 U.S.C. § 2201**

16  **(As Related to the MAO Assignor's Unreimbursed Payments)**

17

18      160.   Plaintiff re-alleges and incorporates by reference each of the

19  allegations contained in the preceding paragraphs 1-111 as if fully set forth

1   here.

2   161.   Plaintiff alleges that as part of providing Medicare benefits under

3   the Medicare Advantage program, Plaintiff's assignor paid for items and

4   services which were also covered by no-fault, personal injury protection, or

5   medical payments policies issued by Defendants.

6   162.   Defendants entered into settlements with beneficiaries relating to

7   accidents but failed to reimburse Plaintiff's assignor for accident-related

8   medical expenses paid by Plaintiff's assignor. As primary payers, Defendants

9   had a nondelegable duty to reimburse conditional payments advanced by

10  Medicare participants for accident-related medical services rendered to covered

11  persons. Defendants are liable for reimbursement of these accident-related

12  medical expenses, even if they subsequently paid out the maximum benefits

13  under the policies.

14  163.   Defendants were required to timely reimburse Plaintiff's assignor

15  for conditional payments made on behalf of beneficiaries' accident-related

16  medical expenses.

17  164.   An actual, present, and justiciable controversy has arisen between

18  Plaintiff and Defendants concerning their obligation to reimburse Plaintiff's

19  assignor.

165.   Plaintiff seeks a declaratory Judgment from this Court establishing that Defendants have a historical, present, and continuing duty to reimburse Plaintiff's assignor for payments made on behalf of beneficiaries' accident-related medical expenses.  Plaintiff also seeks a declaration of what amounts are due and owing by Defendants to Plaintiff's assignor.

166.   A determination of what amounts are owed by Defendants to Plaintiff's assignor is complicated and difficult.

167.   A coordination-of-benefits process requires plans to share information between the primary payer and secondary plan and to act in good faith.

168.   The Code of Federal Regulations defines the coordination of benefits system as a "coordination of benefits transaction."[18]

169.   The coordination of benefits transaction involves the exchange of thousands of claims data and data points between the parties to determine overlapping instances where Plaintiff's assignor made payment of medical items and services on behalf of a Medicare beneficiary who was entitled to the benefit of insurance coverage provided by the Defendants. This includes not

_____

[18] The "coordination of benefits transaction" is the transmission from any entity to a health plan for the purpose of determining the relative payment responsibilities of the health plan, of either of the following for health care: (a) claims and (b) payment information. 45 CFR § 162.1801.

1   only instances in which a Medicare beneficiary was directly insured by

2   Defendants, but also instances in which a Medicare beneficiary was injured by

3   Defendants' policyholder.

4       170.   The exchange of claims data would need to be done by extracting

5   and producing certain data fields from Defendants' and Plaintiff's databases by

6   using demographic identifiers, such as Social Security Number ("SSN"),

7   Health Insurance Claim Number ("HICN"),[19] date of birth, sex, and address.

8   Beneficiary matching pinpoints the number of relevant insureds and simplifies

9   the process of identifying reimbursable claims, which is done by matching the

10  date of loss (for Defendants), with dates of payment (for Plaintiff), and then

11  discovering what Defendants reimbursed (if anything), and to whom.

12

13      171.   Given the size of the claims and data points being exchanged

14  between the parties, the coordination of benefits transaction is complex.

15      172.   Thus, Plaintiff lacks an adequate legal remedy to obtain the

16  requested information.

---

[19] Also known as a Medicare Beneficiary Identifier ("MBI").

1                              **<u>JURY TRIAL DEMAND</u>**

2           Plaintiff demands a trial by jury on all of the triable issues within this

3      pleading.

4                             **<u>PRAYER FOR RELIEF</u>**

5           WHEREFORE, Plaintiff seeks a judgment against Defendants granting

6      the following relief:

7           i.      A judgment for any secondary payments made by Plaintiff's MAO

8    Assignor which Defendants should have paid based on its primary payer status

9    for First Party Policy Claims and Settlement Claims;

10         ii.     A judgment awarding double damages for those amounts to which

11    Plaintiff is entitled to reimbursement as allowed under 42 U.S.C. §

12    1395y(b)(3)(A);

13         iii.    In the alternative, a declaratory judgment for the relief requested

14    in Count V;

15         iv.    A judgment awarding Plaintiff pre-judgment and post-judgment

16    interest;

17         v.     Attorneys' fees as may be allowed under any applicable law;

18         vi.    Tolling any applicable statute of limitations for First Party Policy

19    Claims and Settlement Claims Defendants were under a duty to report pursuant

1    to Section 111 but concealed by means of its failure to properly report; and

2         vii.    A judgment awarding Plaintiff such other and further relief as the

3    Court deems just and proper under the circumstances.

4    Dated: October 15, 2023

5

6                              Respectfully Submitted:

7                              */s/ Alex R. Straus*
8                              Alex R. Straus, Esq.
9                              CA Bar No.: 321366
10                             **MILBERG COLEMAN BRYSON**
11                             **PHILLIPS GROSSMAN, PLLC**
12                             280 S. Beverly Drive, Penthouse
13                             Beverly Hills, California 90212
14                             Tel.: (919) 600-5000
15                             Fax: (919) 600-5035
16                             Primary Email: astraus@milberg.com
17                             Secondary Email: ralves@milberg.com

18